# AFFIDAVIT OF RICHARD MCGOUGH

I, Richard McGough, make the following statement voluntarily:

1.

My name is Richard McGough. I have worked as a mitigation specialist since 1990 at both the State and Federal levels. I have an MA in Anthropology. My cultural area for my graduate work was Latin America. I have worked and traveled extensively in Latin America and Spain. I am fluent in Spanish. Since the mid-90's, I have been involved as a mitigation specialist in capital cases involving Latino defendants residing in the US. I have traveled to clients' native countries to complete my work in those cases. In the last few years, I have worked on numerous cases involving defendants with some affiliation to MS-13 (Mara Salvatrucha) Since 2006, I have traveled to El Salvador on 12 occasions, working for a period of 7 days to 2 weeks each trip.

2.

In 2008, I was asked by John Bryson to assist him in the case of Alejandro Umaña. In the summer of 2008, I had scheduled a trip to El Salvador in another case. At that time, I had not yet been appointed to Mr. Umaña's case but suggested to Mr. Bryson that I could possibly make some initial contact with Mr. Umaña's family while in El Salvador.

3.

In August of 2008, I traveled to the Santa Ana area in order to make contact with Mr. Umaña's father, Rafael Umaña. I found Rafael at the stand from which he sells goods on the streets of Santa Ana. When I met him, his wife, Yanera, and their young daughter were present.

4.

Rafael told me that he is a street vendor (vendedor ambulante) and has sold his goods from the same spot in front of the Museo de Santa Ana for a number of years. He told me that he is well known among the shopkeepers in that area. Rafael stated that he is involved in the local organization of street vendors that was organized to work with the office of the mayor's office (Alcaldia) to license and regulate street vendors. Rafael stated that he holds the position of Secretaria de Actas for the committee.

1

5.

I told Rafael about the charges his son, Rafael, faces in the United stated and that it was very possible Alejandro might face a death penalty should he be found guilty of those charges. I explained to Rafael that part of my work was to assist Alejandro's attorney in coming to understand Alejandro's personal and family history in an effort to convince the Court and jurors that Alejandro should be given a life sentence should he be found guilty. I explained to Rafael that I would need to talk with him and other family members at length in order to do my work and that I would return to do that sometime later that year or early the next year. Rafael gave me his cell phone number. Rafael agreed to introduce me to other family members upon my return. I took Rafael's photograph, along with his wife and daughter, and later brought that back for Alejandro to have in his cell.

6.

During this initial conversation, I didn't elicit much information from Rafael except to ask him about the origin of a visible scar that Alejandro has on his forehead. Rafael explained to me that that resulted from an accident that Alejandro had as a child. He told me that other family members, such as Alejandro's paternal aunt and grandmother, could give me more information about the accident. Rafael recalled running to the hospital with Alejandro in his arms following the accident.

7.

I wasn't able to return to El Salvador to work directly on Alejandro's case until May of 2009. At that time, I traveled to Santa Ana and again located Rafael at his spot across from the Museum in Santa Ana. Rafael told me that he was reluctant to talk with me about Alejandro's case and that he did not want to introduce me to his family in order for me to interview them. Rafael stated that in February of 2009, he was first contacted by what he described as two detectives of the PNC (Policia Nacional Civil or the National Civil Police) while manning his regular post on the street there in Santa Ana.

He stated that both men were dressed in normal street clothes. Rafael said that the men told him that they were there to help Rafael's son, Alejandro Umaña. Rafael stated that the two men told him that they were there that day in order to locate Rafael and that they were also trying to locate Alejandro's mother, Leticia Ramirez. Rafael said that he told the two detectives that he had lost contact with Leticia and could not help them find her.

Rafael said that a few days later, the two men returned and found Rafael again at his post across the street from the Museo de Santa Ana. Rafael said that the two detectives told Rafael that they wanted Rafael to accompany them in their car to a local hotel. Rafael said that he recalls that they wanted him to go to a local auto-hotel called the Hotel Presidencial. Rafael stated that the two detectives explained to him that they wanted

2

Rafael to meet with an agent of the FBI and that the hotel was a quiet place to talk. Rafael said that the detectives told Rafael that they had located Leticia and had spoken with her.

Rafael said that he told the detectives that he didn't want to get in the car with them. He said that one of the detectives took out his cell phone and called the American agent and gave the phone to Rafael to talk with this man identified as "Jo" or "Jog". Rafael said that he spoke with this agent on the phone. Rafael said that the man on the phone spoke Spanish but did not appear to be a local Salvadoran and perhaps was not a native Spanish speaker. Rafael said the man identified as "Jo" told Rafael that they would be better able to talk at the hotel. Rafael said that he told "Jo" that he didn't want to go to the hotel. Rafael said he asked "Jo" if they had in fact found Leticia and spoken with her. Rafael said that "Jo" told him that they had not located Leticia. Rafael said that when he informed "Jo" that the PNC detectives had stated that they had located Leticia, "Jo" said "Are you now investigating me?" Rafael said that he became concerned about the mention of the word "investigation" and wanted to know if he, Rafael, was under investigation. Rafael said that he declined to accompany the detectives.

Rafael said that the PNC detectives criticized him and tried to convince him to accompany them to talk with "Jo". Rafael said that one of the detectives told Rafael that they, the detectives, might begin an investigation of Rafael.

Rafael said that because of this incident with the PCN detectives and the agent "Jo", he does not want to introduce me to his family members for fear that he and his family might suffer reprisals. Rafael stated that there is nothing that Alejandro's lawyers can do to protect Rafael and his family from possible retaliation.

When asked if the PCN detectives or "Jo" had given Rafael any kind of contact information, Rafael replied that they gave him their cell phone numbers. Rafael said that he wrote down the following information about the police in his agenda:

7092-3691: Rafael showed me that after this number he made the notation "PC-D" for "policía civil-detective."

7946-6765: Rafael showed me that after this number he made the notation "Jog" to signify the number for the agent "Jo" or "Jog".

8.

During the remainder of my week there in El Salvador in May of this year, I traveled daily to Santa Ana in order to try to convince Rafael to introduce me his family members. I made many efforts to locate these relatives on my own but with no success.

9.

I returned to El Salvador again in August of 2009 to continue my work in Alejandro's case. I again traveled to Santa Ana and met again on a number of occasions with Rafael.

3

Case 3:08-cr-00134-RJC-SCR   Document 689-1   Filed 09/22/09   Page 3 of 4

He again told me that he was too concerned about his family's safety to introduce me to other family members. Rafael will talk to me but is visibly reluctant to give much in the way of details about Alejandro's and the family's history. I continued my efforts to locate family members on my own but to no avail.

10.

In the 3 years since I have been working in El Salvador I have learned that it is difficult to locate individuals without the assistance of a family member or acquaintance for the initial introduction. From my years working as a mitigation specialist I know that the type of information necessary to a mitigation presentation at trial will be found primarily with family members or other care givers. Without access to those individuals, I can not adequately assist counsel in their defense of Alejandro. To be more specific, I am aware that our expert has determined that Alejandro has a low IQ. In order for our experts to confirm any adaptive behavior functioning deficits that Alejandro might have exhibited, I must first be able to locate and interview family members. Next, a defense mental retardation expert would need to travel to El Salvador to conduct interviews with these family members for the purpose of assessing Alejandro's adaptive behavior deficits, if any. Without access to family members, we will not be able to get an expert opinion as to whether or not Alejandro is mentally retarded.

Sworn and ascribed before me this _18_ day of _Sept._, 200_7_.

_____
NOTARY PUBLIC

My commission expires the _19_ of _Aug_, 20_04_.

4