IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:08cr134

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>vs. )<br>) **ORDER**<br>)<br>ALEJANDRO UMANA (2) )<br>_____ ) | |

**THIS MATTER** is before the Court on motion of the defendant to declare him ineligible for the death penalty based on mental retardation, (Doc. No. 690), and his supporting memorandum, (Doc. No. 750). For the reasons that follow, the Court finds that the defendant has not established by a preponderance of the evidence that he is mentally retarded; therefore, the motion will be denied.

I. BACKGROUND

The defendant is charged with capital offenses among various charges relating to an alleged RICO conspiracy involving the MS-13 gang. (Doc. No. 275: Notice).[1] However, a death sentence may not be carried out on a mentally retarded person. 18 U.S.C. § 3596(c). Based on the defendant's motion to determine whether he is mentally retarded prior to trial, the Court held an evidentiary hearing

---

[1] The precipitating murders charged in the indictment allegedly occurred in a restaurant in Greensboro, North Carolina, on December 8, 2007, after which the defendant allegedly fled to Charlotte, North Carolina, with the assistance of MS-13 gang members. (Doc. No. 623: Indictment at ¶ 23(kk)).

on November 30, 2009.[2]

The defendant called three expert witnesses at the hearing: Dr. John Olley, Dr. Ricardo Weinstein, and Dr. James Merikangas. Dr. Olley is a psychologist licensed in North Carolina who focused on the defendant's adaptive abilities.[3] (Tr. 5; Def. Ex. 1).[4] Dr. Olley interviewed the defendant in jail and interviewed family members, a school official, former employers, and friends of the defendant in El Salvador with the assistance of an interpreter. (Tr. 39; Def. Ex. 2). Dr. Weinstein is a psychologist licensed in California who performed intelligence testing on the defendant.[5] (Tr. 144, 153; Def. Ex. 13 and 14). Dr. Merikangas is a medical doctor licensed in Maryland, with certifications in psychiatry and neurology, who conducted a neurological examination of the defendant and interpreted a radiological scan of the defendant's brain.[6] (Tr. 261, 265, 270, Def. Ex. 15 and 16).

The government called Dr. Enrique Suarez, a psychologist licensed in Florida who conducted intelligence testing on the defendant and also focused on the defendant's adaptive abilities.[7] (Tr. 286;

---

[2] Courts have determined that pretrial hearings are in the interest of judicial economy. United States v. Davis, 611 F. Supp. 2d 472, 474 (D. Md. 2009) (collecting cases).

[3] Dr. Olley stated he had testified approximately 16 times in state or federal court, always on behalf of a defendant, except in 1 state case. (Tr. 80).

[4] The transcript of the hearing is filed at Doc. No. 932.

[5] Dr. Weinstein stated he had testified in over 100 cases. (Tr. 152). In cases involving the death penalty, he had always testified on behalf of a defendant. (Tr. 188).

[6] Dr. Merikangas estimated that he had testified more than a dozen times in federal court, including at least 1 appearance on behalf of the government. (Tr. 264).

[7] Dr. Suarez estimated that he had testified in over 900 cases in state and federal court, appearing approximately 650 times for the defendant and nearly 200 times for the government. All of his approximately 5 appearances in federal court had been on behalf of the government. (Tr. 287-288).

Gov't Ex. A2). Dr. Suarez interviewed the defendant and three officers who had interacted with him in jail. (Tr. 291; Gov't Ex. A3). During the hearing, the Court received exhibits, including the reports, curriculum vitae, and electronic presentations of the witnesses, as well as letters and other communications of the defendant.

II.     DISCUSSION

   A.     Legal Standard

In Atkins v. Virginia, 536 U.S. 304, 321 (2002), the Supreme Court held that the Eighth Amendment prohibits imposing the death penalty on mentally retarded persons. In referencing clinical definitions of mental retardation, the Supreme Court recognized they require "not only significant limitations in intellectual functioning, but also significant limitations in adaptive skills, such as communication, self-care, and self-direction that became manifest before age 18." Id. at 318. The definitions of mental retardation by the American Association on Mental Retardation (AAMR)[8] and the American Psychiatric Association (APA) were mentioned in a footnote, Id. at 309 n.3.

The AAMR's definition provides that:

Mental retardation relates to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.

AAMR, Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed. 2002).

---

[8] This organization is now called the American Association on Intellectual and Developmental Disabilities (AAIDD). A new edition of the organization's manual was published in 2010, but the defendant does not contend the definition has been substantively revised. (Olley, Tr. 16-17).

The APA's definition states that:

> The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academics, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C).

American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000).

### B. Factual Findings

#### 1. Intellectual Functioning

In order to establish that he is mentally retarded, a defendant must prove he has substantial limitations in intellectual functioning.[9] Intelligence quotient (IQ) testing is recognized as an important, but not exclusive, indicator of intellectual functioning. Maldonado v. Thaler, — F. Supp. 2d —, 2009 WL 3074330, at *17 (S.D. Tex. 2009). It is generally accepted that an IQ score two standard deviations below the mean, or a score of 70 where the mean is 100, is the threshold for mental retardation.[10] (Olley, Tr. 19; Weinstein, Tr. 70; Suarez, Tr. 289). Although IQ testing theoretically results in a standardized, objective measure of intelligence, there was sharp disagreement at the hearing regarding the testing methods employed by Drs. Weinstein and Suarez which resulted in divergent IQ scores for

---

[9] The defendant did not dispute that he bears the burden to prove mental retardation by a preponderance of the evidence. (Tr. 4), See Davis, 611 F. Supp. 2d at 474 (defendant's burden of proof).

[10] Some states, such as North Carolina, use an IQ of 70 as a prerequisite to a finding of mental retardation. Larry v. Branker, 552 F.3d 356, 368 (4th Cir. 2009).

the defendant.[11] Given the Court's factual findings below regarding the defendant's adaptive skills, it is not necessary to resolve the conflicting evidence regarding his intellectual functioning.

2. Adaptive Skills and Functioning

Even if the defendant were able to establish an IQ score within the range allowing for mental retardation, he must also show significant limitations in adaptive skills. Atkins, 536 U.S. at 318. The AAMR and APA definitions of mental retardation considered by the Supreme Court in Atkins require present significant limitations in at least two of the following skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Id. at 309 n.3. These are the skills required for adults to function in their every day lives. Although the focus of the definitions is the current level of functioning, Holladay v. Allen, 555 F.3d 1346, 1353 (11th Cir. 2009), courts have looked retrospectively at defendants' lives because mental retardation, if present, inhibits skills that should emerge during the developmental period, that is, birth to age 18, United States v. Davis, 611 F. Supp. 2d 472, 476 (D. Md. 2009).

Standardized tests, such as the APA's Diagnosic and Statistical Manual, Fourth Edition (DSM-IV), and the Adaptive Behavior Assessment System (ABAS), are available to measure adaptive skills objectively. This case presents particular difficulty as Drs. Olley and Suarez each chose not to use such tests because they are not standardized based on the El Salvadoran population. (Def. Ex. 2 at 5;

---

[11] For example, Dr. Weinstein found the defendant's full scale IQ score to be 66, below the threshold for finding mental retardation, using the Spanish translation of the Wechsler Adult Intelligence Scale III (WAIS III) standardized in Mexico. (Def. Ex. 14 at 1-2). Dr. Suarez administered the Spanish translation of the WAIS III standardized in Puerto Rico and found the defendant's full scale IQ score to be 93, well above the mental retardation threshold. (Gov't Ex. A3 at 14).

5

Suarez, Tr. 34739). Instead, they interviewed the defendant and persons familiar with him to assess his adaptive skills. Recognizing that "[t]he adaptive behavior prong is the most fact-intensive, and subjective, part of the mental retardation inquiry," Maldonado, — F. Supp. 2d —, 2009 WL 3074330, at *33,[12] the Court must distill from the record whether there is evidence of intellectual impairment that produced "real-world disabling effects" in the defendant's life, User's Guide: Mental Retardation 24-25 (AAIDD, 2007), causing him to need "supports and protections," Mental Retardation 33 (AAMR 2002).

a. Communication

Evidence regarding the defendant's communication skills came through his interaction with Drs. Olley, Weinstein, and Suarez; information reported by persons who know the defendant; and letters and recorded telephone conversations of the defendant. In summary, the evidence does not show that the defendant has a significant limitation in the ability to communicate, even though his writing reflects the fact that he is uneducated.

Dr. Olley testified that the defendant willingly answered questions and was able to provide factual information about his life and family. (Tr. 43). Dr. Weinstein noted that the defendant has verbal strengths. (Tr. at 163). Dr. Suarez testified at length regarding the information relayed to him by the defendant about his personal and family history, his experience in jail, and his understanding of his case. (Tr. 299-321). None of the doctors indicated any difficulty in communicating with the defendant.

Others who know the defendant have likewise not experienced problems in their interactions

---

[12] That court noted that the same evidence can be viewed by defense experts who conclude the glass is half-empty and government experts who conclude it is half-full. Maldonado, — F. Supp. 2d —, 2009 WL 3074330, at *34.

with the defendant. The mother of his child in El Salvador knew the defendant before he came to the United States. (Olley, Tr. 68). She told Dr. Olley that the defendant was responsible toward his child and had treated her respectfully. (Id.). Each of the corrections officers interviewed by Dr. Suarez reported that the defendant had been cooperative with them and made appropriate requests for things he needed, despite his limited ability to speak English. (Gov. Ex. A3 at 19-23). One officer noted that he observed the defendant teaching Spanish to other inmates. (Id. at 22).

The government provided some of the defendant's letters and telephone calls intercepted by jail officials which had been decoded and translated.[13] Dr. Olley described how the defendant used a code when speaking that involved reversing syllables in words and a code in writing that involved letter substitution. (Tr. 70-71). He also relayed that a translator told him that the defendant did not separate words, that he spelled words incorrectly, and that there was no sequence to his thoughts. (Tr. 69). Dr. Suarez found the defendant's coded letter writing to be significant because it evidenced the defendant had something in his mind that he wanted to say and was aware of the need to prevent other people from reading the letters. (Tr. 366). Having reviewed the letters, the Court finds that the defendant is able to communicate cogently in writing, including expressing feelings;[14] giving directions to use a code when

---

[13] The defendant did not claim someone else had written the letters.

[14] In a letter postmarked September 8, 2009, mailed under a different name, the defendant wrote to Jamie Sandoval, a co-defendant, "Look they [his attorneys] are even going to have my dad come so I can see him and so he can be present during the trial but I have been thinking that when they sentence me that is going to mess with his head and I don't want that." (Letter JMU 148).

7

writing;[8] making jokes, even sexual innuendo;[8] requesting legal intervention;[8] and an understanding of concepts, such as constitutional rights.[9] It is also clear from the letters that the defendant read mail directed to him. (Letter JMU 56).

Accordingly, the evidence establishes that the defendant does not have significant limitations in communication. Although his writing reflects his lack of formal education, he has the ability to communicate in writing and orally so that others can understand the ideas he is conveying.

      b.      Self-care

Information about the defendant's ability to care for himself came from the same people that described his ability to communicate. Dr. Olley related that the defendant's father said the defendant lived with him until age 16. (Tr. 53). After that, the defendant worked for a building contractor and lived with his family. (Id.). The defendant told Dr. Suarez that he quit that job after 18 months when he left El Salvador to come to America. (Tr. 310). It is to be expected that the defendant would have lived with a family during his childhood and teenage years. Except for the defendant's father's report that the

---

[8] In a letter postmarked July 1, 2009, the defendant wrote to Carlos Figueroa, a co-defendant, "Make yourself an ABC and send it within the letters and I am going to find it." (Letter JMU 56).

[8] Congratulating someone for finally responding to one of his letters, the defendant wrote, "You responded to one of my letters and your prize is going to be A ONE EYED BIG HEAD DOLL Just tell me how I can send it to you because that's your prize I hope you enjoy it ha-ha-ha I hope you play with it and give it little kisses on the little head where it has the eye ha-ha-ha." (Letter JMU 22) (all capital letters in original).

[8] In a letter dated July 27, 2009, the defendant wrote the Consulate of El Salvador, "Well after this little greeting I'll move on to my next issue I am Alejandro E. Umaña, and I write to you to see if you can help me with a case I am fighting in North Carolina in Mecklenburg County and I am afraid they would like to give me the death penalty or life in prison for some crimes." (Letter JMU 2).

[9] In letter JMU 148, the defendant relates his attorneys' strategy to argue that police violated constitutional laws when he was interrogated.

8

defendant had poor memory (Tr. 54), there is no evidence that he required special support in the area of self-care prior to age 18.

The only information about the defendant as an adult came from the defendant and his jailers. Some courts have discounted the value of such evidence under the theories that persons with mild mental retardation are likely to embellish their description of their skills to avoid stigma and that highly structured environments, like jail, do not provide a realistic picture of how a person would function on his own. Davis, 611 F. Supp. at 494-95. In the circumstances of this case, the Court credits the testimony of Dr. Suarez about the defendant's ability to care for himself as an adult because the details the defendant provided are verified by other evidence. For example, the defendant reported that he drove himself around the country, including from New York to Atlanta and from Greensboro to Charlotte. (Gov't Ex. A3 at 6). Dr. Olley testified that the defendant showed him on a map that Interstate 85 south is used to go from Greensboro to Charlotte. (Tr. 108). The defendant reported a history of migraine headaches since age 4 or 5, (Gov't Ex. A3 at 7), and during the evidentiary hearing he experienced one and vomited during a break, (Tr. 285).

Accordingly, the Court finds that the defendant's and correctional officers' reports of his ability to recognize his own needs and seek to have them met, Gov't Ex. A3 at 7-9, 20-23), are credible and persuasive. Thus, the defendant has not shown by a preponderance of the evidence that he has substantial limitations in the area of self-care.

    c.    Home Living

As detailed above, Dr. Olley testified that before age 18, the defendant did not maintain his own home, as would be expected. The only information at the hearing about the defendant's home living

after age 18 came from the defendant through Dr. Suarez. The defendant related that he has lived in motels or shared a room with co-workers in North Carolina and Georgia which would cost approximately $130 per week.[10] (Gov't Ex. A3 at 6). He liked to eat breakfast at fast food restaurants, but when he had the ability to cook, he would make soup or combine what was available for a meal. (Id.). He purchased clothes and basic items at discount or second-hand stores, but bought his shoes at malls. (Id.). He washed his clothes by hand or at coin laundromat. (Id.). When he needed a telephone, he used public phones, but at the time of his arrest in 2008, he had obtained a mobile phone. (Id.). Given the correctional officers' accounts of the defendant's cleaning his cell, taking care of his clothes, and using the telephone while in custody, (Gov. Ex. A3 at 20-22), the Court finds the defendant's statements to Dr. Suarez to be credible. Thus, the defendant has not proven that he has substantial limitations in home living.

          d.      Social Skills

As summarized in the area of communication, the evidence shows that the defendant has the ability to communicate effectively with others. Dr. Olley related that the family the defendant lived with in El Salvador described his behavior around others as child-like. (Tr. 66). Dr. Olley opined that the defendant joined the MS-13 gang out of naivete and was victimized by the gang. (Tr. 127). However, Dr. Olley admitted that people in El Salvador refused to discuss the defendant's involvement in the gang, that he did not speak to any gang members to determine whether the defendant was a leader or follower, and that he did not listen to any of the jail calls. (Tr. 53, 68, 127).

---

[10] In-Town Suites currently advertises weekly rates in Atlanta, Georgia, as low as $149.99. See http://www.intownsuites.com/detail_metro.asp?city=Atlanta.

The Court has reviewed the defendant's interaction with others, reflected in his interviews with law enforcement, telephone calls from jail, and letters, and finds that Dr. Olley's opinion regarding the defendant's social skills is not persuasive. The Court finds that the evidence establishes the defendant's ability to respond to various social situations: he has been pleasant and cheerful with family and friends, (Def. Ex. 2 at 7); he has been respectful to those in authority, (Gov't Ex. A3 at 20-21); he has exercised authority and given direction to others in MS-13, (Letter JMU 18); and he has responded with hostility to those who opposed or threatened him, (Gov't Ex. A3 at 13-14; Letter JMU 13). Therefore, the defendant has not established that he has substantial limitations in social skills.

    e.  Community Use

The next area of consideration is use of community resources. Dr. Olley provided school records from El Salvador showing that the defendant withdrew from school without completing the third grade. (Def. Ex. 3). The official who provided the records was not at the school when the defendant attended and, thus, could not state whether the defendant's low grades and withdrawal were the result of intellectual deficits or poor effort and supervision.[11] (Tr. 94). There was no evidence of any other community resources available to the defendant in El Salvador. The evidence about his use of community resources in America came from the defendant himself. He told Dr. Suarez about sending money to El Salvador via Western Union. (Gov't Ex. A3 at 4). Also, he took his wife to the hospital in a taxi when she was in labor and later took the child to the doctor on different occasions. (Id. at 5). He

---

[11] The defendant told Dr. Suarez he dropped out after his grandmother died and there was no one to supervise him. (Tr. 307).

11

never obtained a driver's license,[12] but he purchased vehicles which he drove until he could no longer afford them. (Id.). He said he never received any disability payments, (Id. at 6), but there was no evidence that he sought such assistance or should have. Thus, the defendant has not proven he suffered substantial limitations in using community resources.

    f. Self-direction

As noted above, the Court is not persuaded by Dr. Olley's theory that the defendant did not live independently in El Salvador and that he joined a gang because he lacked the ability to direct himself. Likewise, the Court finds that Dr. Olley's opinion that the defendant's travel from El Salvador to California and then to New York was only accomplished at the direction of others, (Tr. 70), is not supported by any evidence in the record. It was clear that the defendant traveled with another person and that they took advice from people about how to cross international borders and reach their destination, (Suarez, Tr. 300-302), but no evidence suggests that the defendant was led by the hand, unable to make decisions. The defendant's ability to travel across the country, as evidenced by his traffic accident in Georgia and arrest in North Carolina, shows his ability to make decisions to pursue employment or visit people and take the necessary steps to carry out a plan. Additionally, the defendant's letters reflect a choice not to give information to the police, even though he knew some gang members were. (Letter dated June 16, 2009, to Carlos Figueroa). Therefore, the defendant has not shown that he has substantial limitations in self-direction.

    g. Health and Safety

---

[12] The defendant said he was able to obtain an identification card while in New York. (Suarez, Tr. 300).

Evidence presented at the hearing shows that the defendant was aware of his needs regarding health and safety. The defendant and people who knew him reported that he suffered from frequent headaches. (Def. Ex. 2 at 7; Gov't Ex. A3 at 7). After he was placed in jail, the defendant told medical personnel about his head injury and headaches, along with other medical problems. (Gov't Ex. A3 at 9). He further reported that Tylenol usually helped with his headaches. (Id. at 10). The defendant stated, and corrections officers confirmed, that he exercised while in custody, doing push-ups and sit-ups, playing basketball, and walking or running. (Id. at 8, 20). Accordingly, the evidence does not show the defendant had substantial limitations in maintaining his health and safety.

        h.      Functional Academics

A great deal of information was presented at the hearing regarding the defendant's academic skills. As noted above, the defendant did not complete the third grade, which the school official informed Dr. Olley was very unusual. (Tr. 49). Yet, the defendant's grades were not the lowest in the class and it was not unusual for children in El Salvador to drop out of school to go to work. (Tr. 92-93). The defendant himself reported that he quit going to school because of a lack of supervision by his family. (Suarez, Tr. 307). The contractor who employed the defendant as a teenager said that he was able to measure re-bar with a tape measure; however, when Dr. Olley asked the defendant to measure objects with a regular ruler, he made mistakes.[13] (Tr. 102-103). When Dr. Olley showed him a map, the defendant was not able to locate Charlotte, North Carolina, but he was able to identify El Salvador and the United States and describe the interstate used to travel between Greensboro, North Carolina,

---

[13] Dr. Olley admitted the defendant's mistakes using the ruler could be a sign of malingering. (Tr. 104). In a letter, the defendant showed his awareness that the psychological testing by the doctors was to see if he qualified for the death penalty. (Letter JMU 56).

13

and Charlotte. (Tr. 106-108). The defendant's letters reflect his lack of formal education, as shown by misspellings and lack of punctuation, but they also show the ability to read and write at a level sufficient to communicate with other adults.

The defendant's father described the defendant as generally having problems handling money, and one of his employers said that he did not consider the defendant capable of handling money. (Olley, Tr. 54, 59). Evidence from later in the defendant's life, however, reflects that he progressed in the area of mathematics and handling money. The defendant reported to Dr. Suarez that he helped organize a soccer league in El Salvador, which involved hiring a referee. (Tr. 308). Not only did he remember the amount paid to the referee, but he accurately related the exchange rate between El Salvadoran colones and United States dollars. (Id.). Corrections officers observed the defendant using a computer kiosk for checking his commissary account balance and placing orders. (Gov't Ex. A3 at 20-21). In one of his letters, the defendant wrote in detail about his commissary account and accurately did the math to figure his balance.[14]

While the evidence is mixed and presents a closer call than most of the other adaptive abilities, the Court finds that the defendant progressed from the limitations present in his childhood and that the preponderance of the evidence does not show that the defendant is currently substantially limited in

---

[14] The defendant wrote:

So he [defendant's father] put in 22 dollars because I said it [telephone calling card] costs 20 but with taxes it comes out to 21.15 and that's what he put in No little extra for some soup but no problem.

(Letter JMU 22).

14

functional academic skills, such that he needs supports and protections.

    i.  Leisure

Evidence regarding the defendant's leisure activity centered on his interest in soccer. The family the defendant lived with in El Salvador reported that the defendant enjoyed music, dancing, and soccer. (Olley, Tr. 66). The defendant told Dr. Suarez about being good at soccer, not being financially able to play on a traveling soccer team, and organizing games, including hiring a referee and owning his own cleats. (Tr. 307-308). He further reported playing card games, such as rummy, poker, and blackjack. (Gov't Ex. A3 at 8). Accordingly, the Court finds that the defendant has not show he has substantial limitations enjoying leisure activities appropriate for his age.

    j.  Work

As with functional academics, the was a great deal of focus on the defendant's work history at the hearing. Dr. Olley chronicled the various jobs the defendant held or attempted prior to leaving El Salvador with information from the defendant's family and former employers. Dr. Suarez relayed the defendant's work history upon arrival in the United States from interviewing the defendant himself.

The defendant's father stated that the defendant failed at his first job with a shoemaker because he was not able to learn what needed to be done. (Olley, Tr. 52). After attempting some other jobs, the defendant held two positions for more than a year. (Id.). The first was working as a helper on a truck that delivered Coke products when the defendant was 15 years old. (Id. at 52, 58). According to the father and the employer, the defendant was not responsible for driving the truck or managing money, but

simply assisted with carrying products from the truck to the store.[15] (Id. at 58-59). The defendant's other job working for a building contractor began when he was about 17 years old. (Id. at 63). His role was to assist a mason by carrying items, mixing cement, but also measuring and cutting re-bar. (Id. 63-64).

Dr. Olley opined that the defendant functioned in these jobs at the level of his capability which was limited by mild mental retardation. (Tr. 101). However, he admitted that many American teenagers perform similar entry-level roles. (Id. 102). Particularly when considering the defendant's age at the time he entered the work force and the context of the El Salvadoran job market, the Court finds that the evidence does not establish that his limited role was related to any intellectual deficit. During his adult working career, the defendant continued working, usually in the construction field, taking different jobs depending on the opportunity. (Gov't Ex. A3 at 5-6). Although there is no corroborating evidence to support it, there is also no contradicting evidence regarding the defendant's account of working in various jobs digging ditches, washing cars, roofing and installing fixtures in houses, and painting and building fences in the cities of New York, Atlanta, and Greensboro. (Id.).

Courts have found that rote tasks can be mastered by mildly mentally retarded persons. Davis, 611 F. Supp. 2d at 505. While the defendant's childhood and teenage employment reflects such types of work, it is not necessarily attributable to intellectual deficits. His account of adult employment reflects jobs that would require abilities beyond mastery of rote, repetitive tasks. Accordingly, the Court finds that the defendant has not carried his burden to prove he currently has substantial limitations in the area

---

[15] The defendant told Dr. Suarez he did learn to drive the manual transmission truck on rural roads where there was little traffic. (Gov't Ex. A3 at 4).

of work.

k. Additional Evidence

Subsequent to the evidentiary hearing on November 30, the Court conducted the trial of co-defendants in January 2010. Although the Court finds that the information presented at the Atkins hearing is sufficient to find that the defendant does not have significant limitations in adaptive skills, reliable evidence introduced during the trial supports that conclusion.[16] For example, MS-13 gang member Alexander Granados testified that the defendant wrote him a letter from jail wherein the defendant identified two other gang members as snitches. (Doc. No. 907: Tr. 43).[17] Juan Vela Garcia described the defendant as one of the people sent to organize a group of MS-13 gang members in Charlotte. (Doc. No. 906: Tr. 32).

Another gang member, who was cooperating with the police, recorded a conversation with the defendant immediately after the incident in Greensboro. According to the English interpretation of that recording, the defendant explained how they had to high-tail it out of there because of something that they did, that the victims started a beef with the hood, and that the victims thought the gang was a joke. (Gov't Trial Ex. 47A, Session 3 at 8-10). He offered to help the informant strike back at rival gang members who had shot out the rear window of the informant's car and to help the informant shorten his .30-30 rifle by taking off its stock. (Id. 11, 14). He gave another gang member directions about

---

[16] The trial evidence was subject to cross-examination by those sharing an interest with the defendant as the Greensboro homicides were charged as overt acts of a RICO conspiracy and one of the defendants was charged with being an accessory after the fact to murder in the aid of racketeering. All the defendants were convicted of the RICO conspiracy and Defendant Rosales Lopez was convicted of the accessory charge. (Doc. Nos. 842-847: Jury Verdicts).

[17] Citations will be provided where transcripts are currently available.

17

changing clothes and announced his own plan to wash his hands with urine. (Id. 20).[18] When they arrived at a club, the defendant asked whether he would be frisked going in asked where he could go urinate. (Id. 22-25). According to the informant, the defendant asked him to smell the gun involved in the shooting while they were in the bathroom of the club. (Id. at 26). The informant also described how the defendant later attempted to get to the pistol hidden under a couch in a residence when a SWAT team made entry to arrest the him.[19]

Considering all of the evidence presented and definitions regarding adaptive skills, the Court finds that the defendant has not shown by a preponderance of the evidence substantial limitations in the areas identified by the AAMR and the APA as basic to independent living as an adult. There is no evidence to suggest that the defendant required services and protections as an adult to compensate for disabling intellectual deficiencies.[20]

        3.      Manifestation Before Age 18

The evidence was conflicting on whether any intellectual disability was manifest before age 18. Dr. Olley testified that the defendant's father told him about head injuries the defendant suffered when he was 5 years old. (Tr. 68). According to the father, the defendant fell from a mango tree on one

---

[18] The informant testified that it was their understanding that urine would remove gun powder residue.

[19] The pistol was later matched to the shooting in Greensboro.

[20] The Court finds that Dr. Olley's opinion that the gang provided such support and protection, (Tr. 129-130), is unpersuasive. Dr. Olley did not base that opinion on any substantial information and did not investigate the defendant's role in the gang, as compared to other members, and candidly admitted that lack of factual support. (Id.). On the contrary, the trial evidence showed that the defendant was a respected veteran who helped give direction to gang members in Charlotte.

18

occasion and hit his head on a piece of furniture a few days later. (Def. Ex. 2 at 8). The defendant, himself, reported to Dr. Suarez that he fell and cut his head on a bottle between the ages of 4 and 6. (Gov. Ex. A3 at 7). There was no evidence of the extent of any injury from contemporaneous medical treatment in El Salvador.

Dr. Merikangas opined that brain damage indicated in a November 2009 PET scan probably resulted from a childhood injury, but admitted it could have been caused by a series of minor injuries, such as fights or sports injuries. (Tr. 277, 283). Evidence was introduced that the defendant was injured and lost consciousness in a head-on car accident in 2007, that he played soccer extensively, and was involved in fighting in jail prior to the scan. (Tr. 316; Gov't Ex. A3 at 7, 14). Additionally, Dr. Merikangas's opinion on the defendant's mental retardation was not based on the PET scan, but rather psychological testing done by others. (Tr. 277, 279). There is no evidence of any intelligence testing of the defendant prior to age 18, and, as detailed above, details about the defendant's intellectual functioning prior to that time do not show mental retardation. Therefore, the third element of the AAMR and APA's definition was not proven by a preponderance of the evidence.

III. CONCLUSION

A finding of mental retardation requires proof of all three elements of the AAMR and the APA's definition. Here, the evidence on the first element involving intellectual functioning is mixed, and the second or third elements involving adaptive skills and onset before age 18 were not proven by a preponderance of the evidence.

**IT IS, THEREFORE, ORDERED** that the defendant's motion to declare him ineligible for the death penalty (Doc. No. 690) is **DENIED**.

Signed: March 19, 2010

*Robert J. Conrad, Jr.*
Robert J. Conrad, Jr.
Chief United States District Judge