# IN THE DISTRICT COURT OF THE UNITED STATES
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# DOCKET NO. 3:08CR134-RJC

| | |
|---|---|
| UNITED STATES OF AMERICA </br></br> v. </br></br> ALEJANDRO ENRIQUE RAMIREZ UMANA, </br>     a/k/a "Wizard" </br>             "Lobo" </br></br>         Defendant. | ) </br> ) </br> )     **ORDER** </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) |

**THIS MATTER** is before the Court on the defendant's Motion to Determine the Admissibility and Reliability of Evidence of Unadjudicated Acts (Doc. No. 960) filed March 31, 2010; the government's Response (Doc. No. 967) filed April 5, 2010; the defendant's Reply (Doc. No. 985) filed April 10, 2010; and the government's Sur-Reply (Doc. No. 988) filed April 13, 2010. For the reasons stated below, the Court **GRANTS IN PART** and **DENIES IN PART** the defendant's motion.

I.     BACKGROUND

The defendant was charged in a Superseding Indictment with multiple federal offenses arising out of his alleged affiliation with La Mara Salvatrucha, also known as the MS-13 gang (hereafter "MS-13"). Count 1 of the Indictment charged the defendant with a RICO conspiracy, in violation of 18 U.S.C. § 1962(d). As an overt act in furtherance of this conspiracy, the Indictment alleged that on December 8, 2007, the defendant murdered two individuals, Ruben Garcia Salinas and Manuel Garcia Salinas, in a restaurant in Greensboro, North Carolina. These murders were also charged separately in Counts 22 and 24 of the Indictment as murder in aid of racketeering, in

1

violation of 18 U.S.C. § 1959(a)(1), and in Counts 23 and 25 as use of a firearm during and in relation to a crime of violence resulting in death, in violation of 18 U.S.C. § 924(j). The defendant's jury trial began on April 12, 2010. On April 19, the jury returned a verdict convicting the defendant of all charged offenses.

Accordingly, the defendant's capital trial has proceeded to a sentencing hearing as mandated by the Federal Death Penalty Act ("FDPA"), 18 U.S.C. § 3591 et seq. The government has filed a Notice of Intention to Seek the Death Penalty (Doc. No. 275), which lists several aggravating factors it contends justify a sentence of death. Several of these are enumerated aggravating factors listed in § 3592(c) (the "statutory aggravating factors"). The government also gave notice of its intent to prove additional aggravating factors which are not enumerated in § 3592(c) (the "non-statutory aggravating factors"), including the following:

> 4. Participation in Additional Uncharged Murders and Other Acts of Violence.
>
> Apart from the offenses charged in the First Superseding Bill of Indictment, defendant has been involved in other serious acts of violence, which are not reflected in his criminal record. Including but not limited to:
>
> a. On or about July 27, 2005, in Los Angeles, California, defendant knowingly, intentionally, and unlawfully killed Jose Herrera and Gustavo Porras.
>
> b. On or about September 28, 2005, in Los Angeles, California, defendant knowingly, intentionally, and unlawfully participated and aided and abetted the killing of Andy Abarca.

(Doc. No. 275 at 4-5).[1] In addition to the murders alleged to have occurred in Los Angeles (the "Fairfax Street murders" and the "Lemon Grove murder"), the government has also proffered evidence of the defendant's involvement in the murder of Jaime Samayoa while he resided in his

---

[1] Each aggravating factor is also re-alleged with respect to the other murder victim, Manuel Garcia Salinas. (Doc. No. 275 at 5-8).

2

native country of El Salvador (the "El Salvador murder").

The defendant filed a pretrial motion (Doc. No. 483) seeking to strike Participation in Additional Uncharged Murders and Other Acts of Violence from the government's Notice. In the alternative, the defendant filed the instant motion for a hearing to determine the admissibility of evidence of unadjudicated conduct. The Court denied the defendant's motion to strike on April 19, 2010. (Doc. No. 1000: Order). In denying the defendant's motion, the Court instructed the parties that it would bifurcate the defendant's sentencing hearing into an initial phase, "eligibility," and if necessary, a second phase, "selection," where the government could present evidence of non-statutory aggravating factors. The Court then held that Crawford v. Washington, 541 U.S. 36 (2000), would apply to the eligibility phase of the defendant's capital sentencing hearing, but not the selection phase. (Doc. No. 1000: Order at 11). Thus, because the defendant's unadjudicated conduct is alleged as a non-statutory aggravating factor, Crawford does not erect a per se bar against testimonial hearsay statements offered by an unavailable witness not subject to an opportunity for cross-examination.

In making these findings, Court deferred ruling on the admissibility of any specific evidence of unadjudicated conduct, requiring instead that the government submit to the Court and the defendant its proffered evidence of the Fairfax Street murders, the Lemon Grove murder, and the El Salvador murder for in camera review. (Id. at 10-11). That proffer is summarized as follows.

The Fairfax Street Murders

The government alleges that on July 27, 2005, the defendant shot and killed Jose Herrera and Gustavo Porras after an altercation on Fairfax Street in Los Angeles, California. An eyewitness who recalled seeing a participant in the shooting holding a crutch led LAPD Detectives Gene Parshall and Barry Telis to Luis Rivera, an MS-13 member who was injured and on crutches when the

3

murders took place. Rivera gave a statement that he, Eddie Ruiz, Luis Ramos, Rene Arevalo, and the defendant had been riding in a gold colored Nissan sedan on the day of the shooting. Arevalo had been driving. The victims, Porras and Hererra, were seen walking on the sidewalk on Fairfax Street when they displayed rival gang signs to the car. Arevalo then pulled the car over to the sidewalk, and Ramos, carrying one of Rivera's crutches, exited the vehicle to confront the victims. Rivera stated that the defendant also exited the vehicle, drew his firearm, and shot the victims. Rivera made the first of his statements implicating the defendant before police arrested Ramos.

Police then arrested Ramos, who, after initially denying his involvement in the shooting, was placed in a holding cell with Rivera. The holding cell was outfitted with a recording device that allowed police to monitor conversations between Ramos and Rivera. After conferring with Rivera, Ramos gave a statement naming the defendant as the shooter that was largely corroborative of Rivera's, although inconsistent with respect to some details.[2] Months later, LAPD detectives interviewed Arevalo, who gave a similar statement naming the defendant as the shooter.[3]

Rivera, Ramos, and Arevalo were eventually charged in state court as co-conspirators in connection with the Fairfax Street murders. At a preliminary hearing, Parshall and Telis testified subject to cross-examination regarding the statements given by each co-defendant.[4] On April 23, 2008, Los Angeles police conducted a recorded interview with the defendant, who admitted being

---

[2] Ramos denied exiting the vehicle until after the shooting. He also stated that Ruiz, Arevalo, and the defendant displayed gang signs to Herrera and Porras in response to their signs, which Rivera had not admitted.

[3] Arevalo's statement also differed slightly from the statements given by Ramos and Rivera. He told investigators that Ramos shouted "La Mara!" before the defendant shot the victims, which Ramos had omitted from his statement. Arevalo also stated that he did not pull the vehicle over the sidewalk until after the shooting.

[4] The defendant was not present or represented by counsel at this hearing.

4

present at the Fairfax Street murders, confirmed specific details contained in Rivera, Ramos and Averula's statements but denied being the shooter.[5]

The Lemon Grove Murder

The government also alleges that on September 28, 2005, the defendant participated or aided and abetted in the murder of Andy Abarca at the Lemon Grove park in Los Angeles, California. The government elicited testimonial statements by eyewitnesses to the murder, including Juan Lara and Freddy Gonzalez, as relayed by LAPD Detective Thomas Small. Juan Lara and Freddy Gonzalez stated to Small that on the night of the shooting they were sitting with Abarca adjacent to a basketball court at the Lemon Grove park. Two males approached from across the court, and at least one drew a weapon and began firing. Andy Abarca was the only person at the park who was killed, but witness statements suggest that Gonzalez was the intended victim. Although he was never able to make a 100% positive identification, Gonzalez tentatively identified the defendant on two occasions as the shooter from two different "six pack" photographic line-ups.

The defendant's April 23, 2008, recorded interview, if believed, establishes his presence at this shooting as well. During this interview the defendant admitted that he had gone to Lemon Grove park on the night of the shooting in a car driven by a friend, but stated that the shooting was carried out by two unnamed individuals they had dropped off at the park, and that he knew they wer going to take care of rivals. A ballistics report analyzing bullet cartridge casings recovered at both the Fairfax Street murders and the Lemon Grove murder determined that the bullets from booth

---

[5] On April 24, 2009, the defendant filed a motion to suppress this recorded statement from introduction into evidence at his trial, claiming the statement was obtained in violation of his constitutional rights. (Doc. No. 490). The Court conducted an evidentiary hearing to determine the admissibility of the statement on August 26, 2009, and thereafter denied the defendant's motion.

shootings had been fired by the same .22 caliber handgun.

### The El Salvador Murder

Finally, the government alleges that the defendant participated in another murder while residing in his native country of El Salvador. The defendant was prosecuted in an El Salvadoran court on charges alleging that he and co-conspirators decapitated Jaime Samayoa, a purported MS-13 member who had attempted to leave the gang. The government intends to call the prosecuting attorney from the case, who will relay testimonial statements given by witnesses, some of whom testified anonymously.[6] The El Salvadoran court presiding over the defendant's case found that these witnesses' statements lacked consistency and credibility, and acquitted the defendant along with his co-conspirators.

After reviewing this proffer and hearing written and oral argument from both parties, the Court announced its findings, which are stated below.

## II. LEGAL FRAMEWORK

As is required by the FDPA, the defendant's capital sentencing hearing is a separate proceeding from the guilt phase of his trial. See 18 U.S.C. § 3593. At this hearing, the Federal Rules of Evidence do not apply, but evidence[7] "may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). Thus, the FDPA requires the Court to perform a more stringent balancing of probative value against the danger of unfair prejudice than is required under the Federal Rules of Evidence.

---

[6] El Salvadoran court records refer to these witnesses by number only.

[7] The FDPA conspicuously uses the term "information" rather that "evidence," perhaps emphasize that the Federal Rules of Evidence are inapplicable. However, because the parties have often used the term "evidence" in their briefing of these issues, the Court will use that term throughout this Order.

6

See Fed. R. Evid. 403 (under which evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice") (emphasis added). The Fourth Circuit has expressly held that "the FDPA provides a capital defendant with constitutionally sufficient evidentiary protection." United States v. Fulks, 454 F.3d 410, 438 (4th Cir. 2006); accord United States v. Lee, 374 F.3d 637, 648 (8th Cir. 2004); United States v. Fell, 360 F.3d 135, 145-46 (2d Cir. 2004) (reaching the same conclusion).

III. DISCUSSION

A. Evidence of Unadjudicated Conduct Must Demonstrate Reliability

As a preliminary matter, the Court recognizes that although evidence of unadjudicated conduct is not per se inadmissible, it must demonstrate reliability prior to its admission before a capital sentencing jury. Two fundamental constitutional principles compel this standard. First, the qualitative difference between capital punishment and other forms of punishment requires the Court to ensure a heightened degree of reliability in the capital sentencing process. See, e.g., Lockett v. Ohio, 438 U.S. 586, 602-04 (1978); Woodson v. North Carolina, 428 U.S. 280, 305 (1976). Second, a capital sentencing jury should be presented with all relevant evidence so that it may make a principled determination of whether the defendant in fact deserves a sentence of death. See, e.g., Payne v. Tennessee, 501 U.S. 808, 825-27 (1991) (allowing the introduction of victim impact evidence); Barefoot v. Estelle, 463 U.S. 880, 897 (1983) (calling for capital sentencing juries to consider "all possible relevant information " before them) (quoting Jurek v. Texas, 428 U.S. 262, 276 (1976)). The admissibility of unadjudicated conduct at a defendant's capital sentencing hearing often places these fundamental principles in tension with one another. See United States v. Walker, 910 F. Supp. 837, 852 (N.D.N.Y. 1995) ("The issue of unadjudicated criminal conduct lurks squarely at the intersection (read collision) of two powerful but competing principles of death penalty jurisprudence.").

7

Drawing upon these precedents, a number of district courts within the Fourth Circuit have required the government to make a threshold showing that evidence of unadjudicated conduct bears sufficient indicia of reliability before it may be submitted to the sentencing jury. See United States v. Cisneros, 363 F. Supp. 2d 827, 838-39 (E.D. Va. 2005); United States v. Breeden, No. 3:03cr13, 2004 WL 1920981, at *4 (W.D.Va. Aug. 27, 2004); United States v. Foster, No. CRIM. CCB-02-410, 2004 WL 903921, at *1 (D.Md. Apr. 9, 2004); United States v. Beckford, 964 F. Supp. 993, 1000 (E.D.Va. 1997).

Thus, the Court recognizes its duty to ensure that only reliable evidence of unadjudicated conduct is admitted at the defendant's sentencing hearing. This is no less true for testimonial hearsay statements that Crawford would otherwise prohibit. Such statements are admissible upon the Court's satisfaction "from the totality of the circumstances that the statement has particularized guarantees of trustworthiness and the requisite indicia of reliability." United States v. Jordan, 357 F. Supp. 2d 889, 904 (E.D.Va. 2005) (applying a pre-Crawford evidentiary standard to testimonial hearsay statements offered at a defendant's selection phase hearing). Although the Court makes a specific inquiry into reliability, the ultimate standard governing admissibility remains as set forth in the FDPA: whether probative value is outweighed by a danger of unfair prejudice, confusion of the issues, or misleading the jury. 18 U.S.C. § 3593(c). See also Cisneros, 363 F. Supp. 2d at 834-35; Breeden, 2004 WL 1920981, at *4; Foster, at *1 (all making reliability inquiries within the overall evidentiary standard provided for in § 3593(c)). It is under this standard that the Court now analyzes the reliability of the governments proffered evidence of unadjudicated conduct.

B.  The Fairfax Street Murders

With regard to the Fairfax Street murders of Jose Herrera and Gustavo Porras, the statements given by co-conspirators Rivera, Ramos, and Arevalo identifying the defendant as the shooter bear sufficient indicia of reliability and trustworthiness. The detectives who will testify as to these

statements gave prior sworn testimony at a preliminary proceeding subject to cross-examination. Thus, the Court is satisfied that these witnesses will accurately relay the co-conspirators' statements, each of which is a statement against penal interest that names the defendant as shooter and provides other corroborating details, including the make and model of car involved, the presence of crutches, the names of the other participants, the number of victims, and the specific gang signs displayed by the victims. Although there is some evidence that Rivera and Ramos colluded prior to giving some of their statements in an attempt to minimize each other's involvement, police monitored their conversations and were aware of this attempted collusion during subsequent interviews. The fact remains that Rivera identified the defendant as the shooter before ever speaking to Ramos, and many details from each participant's statement are corroborated by the defendant's own recorded statement. To the extent some discrepancies exist between the statements, the defendant will have an opportunity to highlight them during cross-examination of the detective witnesses.

Moreover, other evidence proffered by the government indicates that these statements are trustworthy. The ballistics report linking the Fairfax Street murders to the Lemon Grove murders is especially corroborative: of all the participants present at the Fairfax Street murders, the defendant is only one who, by his own admission, was also present at the Lemon Grove murder. Based on the totality of the facts presented, the Court finds that there is sufficient indicia of reliability in the governments proffered evidence concerning the Fairfax Street murders, and the probative value of this evidence outweighs any danger of unfair prejudice. Accordingly, this evidence is admissible during the selection phase of the defendant's sentencing hearing.

C. The Lemon Grove Murder

With regard to the Lemon Grove murder of Andy Abarca, the hearsay statements given to detectives in that case bear similar indicia or reliability. It appears from the government's proffer

that it intends to call some of these witnesses to testify.[8] The defendant will have an opportunity to cross-examine these witnesses for any inconsistencies present in their statements. Moreover, as stated earlier, the defendant's own recorded statement places him at the scene of this murder as well as the Fairfax Street murders, which are further linked together by ballistics evidence connecting both shootings to a single firearm. All of this demonstrates the reliability of the government's proffered evidence such that its probative value outweighs any danger of unfair prejudice. The government's evidence concerning the Lemon Grove murder is therefore admissible at the defendant's selection hearing, with the one exception noted below.

Unlike the rest of the government's proffered evidence concerning this murder, the Court will not allow hearsay testimony about Gonzalez' identification from photographic displays. The officer's were not present when the shooting occurred (which unlike the Fairfax murders did not occur in broad daylight but at night), did not see the length of time it took to do the shootings or the distance between shooters and victims. If Gonzalez does testify and the government lays an appropriate foundation, the Court will make a determination at trial as to whether his prior photographic identifications will be admitted. In any event, due to the passage of five years from shooting event to trial testimony, under the particular facts of this case, the Court will no permit the government to elicit an in-court identification by Gonzalez finding that the danger of unfair prejudice outweighs its probative value.

D.  The El Salvador Murder

Finally, with respect to the murder of Jaime Samayoa in El Salvador, the Court finds the government's proffered evidence unreliable. It is almost entirely hearsay evidence of conduct for which the defendant was acquitted, based in part upon a finding that these statements—proffered

---

[8] In fact, between the issuance of the oral order and this written one, witnesses Juan Lara and Freddie Gonzalez did testify, subject to cross examination.

here as reliable evidence—lacked credibility. It does not appear that any eyewitness will offer live testimony to corroborate these statements. Moreover, many of the declarant witnesses remain anonymous. The anonymous quality of these witnesses not only undermines the Court's assessment of their accuracy and truthfulness, but it also unfairly limits the defendant's ability to uncover any impeachment evidence that may exist. For these reasons, the Court finds that the government's proffered evidence of the El Salvador murder lacks sufficient indicia of reliability and its probative value is outweighed by a danger of unfair prejudice to the defendant. Thus, this evidence is inadmissible.

IV.    CONCLUSION

**IT IS, THEREFORE, ORDERED** that the defendant's Motion to Determine the Admissibility and Reliability of Evidence of Unadjudicated Acts (Doc. No. 960) is **GRANTED IN PART** and **DENIED IN PART**, such that:

1. The government's proffered evidence concerning the July 27, 2005, murders of Jose Herrera and Gustavo Porras is admissible at the defendant's sentencing hearing;

2. The government's proffered evidence concerning the September 28, 2005, murder of Andy Abarca is admissible at the defendant's sentencing hearing, with the exception of Freddy Gonzalez's prior identifications of the defendant as the shooter, upon which the Court will defer ruling and will bar an in-court identification; and

3. The government's proffered evidence concerning the murder of Jaime Samayoa in El Salvador is inadmissible at the defendant's sentencing hearing.

Signed: April 24, 2010

Robert J. Conrad, Jr.
Chief United States District Judge