**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **DOCKET NO. 3:08CR134-2-RJC** |
| | ) | |
| v. | ) | **DEFENDANT'S MOTION FOR** |
| | ) | **NEW TRIAL ON GUILT AND** |
| ALEJANDRO UMANA | ) | **SENTENCING PHASES** |
| | ) | |

NOW COMES Defendant ALEJANDRO ENRIQUE RAMIREZ UMANA, by and through counsel, pursuant to Rule 33 of the Federal Rules of Criminal Procedure, and hereby moves for a new trial on both the guilt and sentencing phases of the trial. Defendant herein sets forth the various grounds which entitle him to either a new trial or a new sentencing hearing. Additionally, without restating them, Defendant reasserts and maintains every motion, objection, and request previously made, but highlights in this motion the following bases for a new trial and new sentencing hearing.

## 1.    INTRODUCTION

Defendant was convicted by a jury on April 19, 2010, of four death-eligible offenses. On April 28, 2010, the penalty phase ended with the jury recommending death on each of the four offenses. On April 30, 2010, Defendant moved for an extension of time to file motions for new trial. On May 3, 2010, this Honorable Court granted the motion and set June 14, 2010, as the deadline for Defendant to file motions for new trial.

1

2. **THE COURT'S JURY INSTRUCTION ON MURDER IN THE AID OF RACKETEERING ALLOWED THE JURY TO RETURN A VERDICT OF GUILTY AGAINST THE DEFENDANT WITHOUT FINDING THAT HE HAD COMMITTED THE MURDER TO MAINTAIN OR INCREASE "HIS" POSITION WITHIN THE ENTERPRISE.**

The Court's jury instruction for murder in the aid of racketeering, which deleted the pronoun "his" from the instruction as it related to the maintaining or increasing of Defendant's position within the enterprise eliminated the requirement that the Defendant's purpose for committing the crime was for self-promotion. This instruction allowed the jury to convict the Defendant of murder in the aid of racketeering without a finding that Defendant's purpose was self-promotion. This violates the meaning of the statute, 18 U.S.C. § 1959 and entitles the defendant to a new trial.

During the charge conference the Government asked the Court to modify the charge on murder in the aid of racketeering to allow the jury to convict the Defendant of murder in aid of racketeering if they found that the Defendant's purpose in committing the murder was to maintain or increase his or another's position within the enterprise.

>MR. ADAMS: May I ask then, also, for one add addition on page 62, or anywhere really that Your Honor – I have as the first line of page 62, maintain or increase his position or another's – or another member's within the enterprise. ("MR. ADAMS" should be Mr. Adam Morris)

>THE COURT: And what is the basis for that?

>MR. ADAMS: That the theory of defense that Stiler was the leader. And the law allows a conviction if the defendant committed the crime to please Stiler.

April 16 Transcript p. 1076. While the Court declined to insert the phrase "or another's" the Court did omit the word "his" from the proposed instruction. Accordingly, the Court's final instruction to the jury on the element regarding the Defendant's purpose in committing the alleged murder was as follows:

2

In determining whether a person's purpose in committing the alleged murder, assault with a deadly weapon, or other crime was to maintain or increase position within the enterprise, you should give the words "maintain" and "increase" their ordinary meanings. You should consider all the facts and circumstances in making that determination. For example, you may consider evidence that the crime, if proved, was committed in order to maintain discipline within the enterprise and served to maintain position in the enterprise. If the defendant committed the crime because he knew it was expected of him by reason of his membership in the enterprise, or if he committed the crime because he thought it would enhance position or prestige within the enterprise, or if he committed it because he thought it was necessary to maintain the position already held, this element would be established. These examples are only illustrations.

Conversely, it is not sufficient for the murder to be in furtherance of or consistent with the purposes of the enterprise. The defendant had to have had the conscious purpose to maintain or enhance position within the organization. The statute prohibits murders that are committed with the purpose of maintaining or enhancing a defendant's or another's relative position with the enterprise, vis-à-vis other members of the enterprise. In the absence of that specific prohibited purpose, a murder with the purpose of advancing a defendant's or the enterprise's reputation in the broader community is not covered by the statute.

April 16 Transcript, pp. 1246-1247. In each instance where the Court referred to maintaining or increasing position, the Court eliminated the personal pronoun "his". The Court's modification of the instruction allowed the jury to convict the Defendant of murder in the aid of racketeering without finding that he committed the crime to maintain or increase "his" position within the enterprise.

In prior decisions regarding the elements of a violation of 18 U.S.C. § 1959, the Fourth Circuit Court of Appeals has set forth that the purpose element of the crime must relate to the defendant's own position in the gang.

To establish a § 1959 claim, the government must prove beyond a reasonable doubt,

(1) that the organization was a RICO enterprise, (2) that the enterprise was engaged in racketeering activity as

3

> defined in RICO, (3) that the defendant in question had a
> position in the enterprise, (4) that the defendant committed
> the alleged crime of violence, and (5) that <u>his</u> general
> purpose in so doing was to maintain or increase his position
> in the enterprise.

*United States v. Fiel*, 35 F.3d 997 (4th Cir. 1994) (emphasis supplied) citing *United States*

*v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992), *cert. denied*, 126 L. Ed. 2d 124 (1993).

The Fourth Circuit has emphasized that the element in question relates to self-promotion.

> So considered, the evidence sufficed to show the requisite purpose as to
> each of these appellants. We agree with the Second Circuit that this
> purpose can be shown by proof that "a defendant who holds a position in a
> RICO enterprise . . . committed an underlying crime of violence with a
> motive of retaining or enhancing that position"; that such "<u>self-promotion</u>"
> need not be "the defendant's only or primary concern"; and that evidence
> suffices if from it a jury "could properly infer that the defendant
> committed his violent crime because he knew it was expected of him by
> reason of his membership in the enterprise or that he committed it in
> furtherance of that membership."

*United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996) (emphasis supplied) citing

*United States v. Concepcion*, *supra*.

Here, the modified instruction allowed the jury to convict the Defendant of

murder in the aid of racketeering even if they found the Defendant's purpose was

to increase the position of another within the enterprise. This contravenes the

Fourth Circuit's ruling that the purpose element of 18 U.S.C. § 1959 relates to the

defendant's "self-promotion". Accordingly, the modified instruction eliminated

the Government's responsibility of proving one of the elements to the offense.

Accordingly, the Defendant is entitled to a new trial.

3. **THE GOVERNMENT PRESENTED INSUFFICIENT EVIDENCE TO SUBMIT THE CHARGES OF WITNESS TAMPERING AND CONSPIRACY TO COMMIT WITNESS TAMPERING TO THE JURY. THE JURY'S VERDICT ON THESE OFFENSES PREJUDICED THE DEFENDANT'S SENTENCING HEARING BY ALLOWING THEM TO CONSIDER THIS AS EVIDENCE OF FUTURE DANGEROUSNESS.**

In counts 61-63 the Defendant is charged with conspiracy to obstruct justice and tamper with witnesses, obstruction of justice and tampering with witnesses. At the close of the Government's evidence, upon Defendant's motion under Rule 29, the Court dismissed count 62, obstruction of justice, and the obstruction of justice object of the conspiracy under count 61. The jury was nevertheless allowed to consider conspiracy to tamper with witnesses and the substantive tampering with witness counts. The evidence to support the jury's finding Defendant guilty of these offenses was insufficient to support those convictions. Further the jury's verdict of guilty to these offenses prejudiced Defendant in his sentencing hearing in that the jury was allowed to consider this as evidence of future dangerousness in determining the appropriate sentence.

Counts 61 and 63 charge the defendant with entering into a conspiracy with other MS-13 members to prevent the testimony of any person in an official proceeding and to have willfully intimidated another person to prevent their testimony in an official proceeding. The allegations stem from an event that occurred on June 12, 2008 where three MS-13 members went to Las Jarrochitas restaurant in Greensboro in an attempt to dissuade witnesses from participating in any legal proceedings arising out of the murders which occurred on December 8, 2007 at Las Jarrochitas. The Government's evidence did show three MS-13 members traveled from Charlotte to Greensboro on June 12, 2008. One member entered the restaurant and attempted to deliver a message to restaurant

personnel for the purpose of preventing the testimony of witnesses at further proceedings regarding these homicides. However, the Government's evidence was insufficient to connect the Defendant with the June 12 event.

The only evidence which the Government could present that connected the Defendant to this event was the testimony of the cooperating witness, Alexander Granados. Granados testified that he attended a meeting that occurred on June 7, 2008 which was attended by other MS-13 members. During his testimony about the meeting, Granados said the following:

Q.    And what specifically was discussed?

A.    Well, specifically that he had a court date the following week and he sent a message to Misterio so that there won't be somebody speaking out at the court.

April 15 Transcript, p. 890. This single sentence was the only evidence that the Government presented to connect the Defendant in any way to these offenses. The Government presented nothing to corroborate Granados' claim. In fact, the Government's own evidence showed that they were monitoring the Defendant's communications while incarcerated. The Government presented many letters the Defendant had written while incarcerated. Their evidence further showed that they monitored all of his jail phone calls while incarcerated. Yet the Government could present no evidence to support Granados' claim that another MS-13 member claimed to have received a message from the Defendant. The sole basis for the submission of this evidence to the jury was this single line of testimony of one cooperating MS-13 member claiming he heard another MS-13 member claim that the Defendant had sent a message. Clearly this evidence was insufficient to submit these charges to the jury.

The Court's failure to dismiss these charges resulted in the jury returning verdicts of guilty on these two counts. This same evidence was then used by the jury in Defendant's sentencing hearing to support a finding of future dangerousness. Accordingly, the Defendant's sentence of death must be set aside and he must be granted a new sentencing hearing in that the jury was allowed to consider evidence on the issue of future dangerousness that was insufficient to be submitted to the jury for their consideration.

4. **ADMISSION OF EVIDENCE OF UNADJUDICATED MURDERS DURING THE SENTENCING PHASE DENIED DEFENDANT A FAIR CAPITAL SENTENCING HEARING AND DUE PROCESS OF LAW, REQUIRNG A NEW SENTENCING HEARING.**

In its effort to obtain the death penalty against Defendant on Counts 22 through 25, the government filed a "Notice of Intention to Seek the Death Penalty" (Document #273) on September 23, 2008.

As to all four counts, the Notice alleged a non-statutory aggravating factor of "Participation in Additional Uncharged Murders and Other Acts of Violence". The allegations as to this unadjudicated conduct were as follows:

> Apart from the offenses charged in the First Superseding Bill of Indictment, defendant has been involved in other serious acts of violence, which are not reflected in his criminal record. Including but not limited to:
> a. On or about July 27, 2005, in Los Angeles, California, defendant knowingly, intentionally, and unlawfully killed Jose Herrera and Gustavo Porras.
> b. On or about September 28, 2005, in Los Angeles, California, defendant knowingly, intentionally, and unlawfully participated and aided and abetted the killing of Andy Abarca.

In pretrial motions, Defendant sought to strike these aggravating factors from the government's death notice and to exclude such evidence from the sentencing phase of

trial (Document 483 filed 4/24/09, Document 960 filed 3/31/10, Document 985 filed 4/10/10). This Honorable Court denied Defendant's motions and allowed the government to pursue these nonstatutory aggravating factors by introducing evidence of these uncharged murders during the sentencing phase.

The evidence on these aggravating factors presented to the jury during the death penalty selection phase can be readily summarized. As to the alleged July 27, 2005 murders of Jose Herrera and Gustavo Porras, the evidence implicating Defendant as the shooter consisted of LAPD officers testifying to hearsay statements made to them by three suspects who were identified as being present in the car from which the attack came. Luis Rivera, Luis Ramos, and Rene Arevalo each initially lied to the police, denying membership in MS-13. Rivera and Ramos were allowed a weekend in jail to converse and get their stories straight. Thereafter, they minimized their involvement and claimed the shooter was the absent Defendant. Similarly, Rene Arevalo, in minimizing his role, claimed that the others jumped out of the car while it was stopped in traffic, denying advance knowledge of their intent, thereby maintaining that he was not criminally liable. He too conveniently blamed the actual shooting on the one absent suspect, Defendant.

The most reliable of the hearsay evidence presented by the government was that from the two independent eyewitnesses, Noe Bautista and Oscar Santiago. Each of them indicated to the police that the shooter was the driver. Since none of the government witnesses or hearsay declarants claimed that Defendant was the driver, the government's evidence was unworthy of supporting any conclusion that Defendant was the shooter and

was clearly insufficient to support this act as aggravating factor beyond a reasonable doubt.

Similarly, the evidence as to the September 28, 2005, murder of Andy Abarca at Lemon Grove Park was weak.  Two eyewitnesses, Roberto Ramos and Juan Lara, were shown six-pack photo lineups containing Defendant's photo and failed to pick out his photograph as being one of the assailants.  The only evidence putting Defendant in the park at the time of the shooting was the "identification" by Freddy Gonzalez.  However, on both occasions that he was presented with Defendant's photo in a six-pack photo array, Gonzalez was unable to positively identify Defendant.  As established during cross-examination of Gonzalez, his handwritten explanation of his first "identification" was as follows:  "Looks like or resembles the guy who came to the park the day that they killed Andy.  I remember seeing this guy, but I'm not sure if he is the one that came that day to the park with the pistol and shot us."  His handwritten explanation of his second "identification" was as follows:  "My first impression was photo number 5, the way that he has his hair looks the same.  But everything happened so fast that I'm not a hundred percent sure.  He came to the park.  He seemed small.  And what I saw was the gun and after that I began to run.  This is the first and last time I saw the young man."

The government also elicited conclusory hearsay testimony from Detective Small that Rene Arevalo told him that Defendant was the Lemon Grove Park shooter, but Detective Small did not testify as to any basis for believing that Arevalo, who was not present for that incident, had any personal knowledge as a basis for such claim.  Defendant's own statement to police constituted an admission of merely being present as a passenger in the car driven by "Sin" but a denial of being the shooter.  Thus, the

evidence offered by the government to prove that Defendant was the shooter, or even a knowing aider and abettor of the shooting, was insufficient for a jury to be convinced of this aggravating factor beyond a reasonable doubt.

"[T]he qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." Caldwell v. Mississippi, 472 U.S. 320, 329, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231, 239 (1985). A criminal conviction meets this exacting standard of reliability by establishing that the underlying criminal activity was proved beyond a reasonable doubt to the satisfaction of an unbiased jury in conformity with constitutional safeguards. However, a finding of other criminal acts that have not resulted in convictions does not involve the same indicia of reliability. Allegations of unadjudicated criminal conduct lack, *ipso facto*, the reliability necessary to ensure a constitutional sentence. This manifest unreliability is compounded by the relaxed evidentiary standards applicable during the sentencing phase.

"In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors," Morgan v. Illinois, 504 U.S. 719, 727 (1992) (quoting Irvin v. Dowd, 366 U.S. 717, 721-22 (1961)). A jury that has already decided that the defendant is guilty of first-degree murder cannot be expected to impartially and objectively evaluate allegations of unadjudicated criminal behavior in the penalty phase. For this reason, a number of state courts have concluded that admitting evidence of unadjudicated offenses in a capital sentencing hearing violates a defendant's right to due process of law: "[T]o permit the State to present evidence sufficient to convince the jury beyond a reasonable doubt that the defendant had committed murders for which he has

not yet been convicted and before the very jury that has just returned a guilty verdict for first degree murder, violates the concept of fundamental fairness embodied in due process of law . . ." State v. Bobo, 727 S.W.2d 945, 952-53 (Tenn.), *cert. denied*, 484 U.S. 872 (1987). See also State v. Bartholomew, 101 Wash.2d 631, 640-42, 683 P.2d 1079, 1086 (1984) ("[a] jury which has convicted a defendant of a capital crime is unlikely fairly and impartially to weigh evidence of prior alleged offenses"); State v. McCormick, 272 Ind. 272, 279-80, 397 N.E.2d 276, 281 (1979) ("[t]he facts regarding this alleged aggravating crime will never have been presented to an impartial, untainted jury, and the risk that the previously tainted jury will react in an arbitrary manner is infinitely greater").

The Supreme Court held in Johnson v. Mississippi, 486 U.S. 578, 585, 108 S.Ct. 1981, 1986, 100 L.Ed.2d 575, 584 (1988) that the presumption of innocence applies to evidence of other criminal acts at the penalty phase unless the presumption has been rebutted by a conviction after a jury trial. See also Cook v. State, 369 So.2d 1251, 1257 (Ala. 1978) ("Until the State proves him guilty of this charge in accordance with appropriate legal procedures Cook is presumed innocent. This fundamental tenet of our system of justice prohibits use against an individual of unproven charges in this life or death situation."). In Johnson v. Mississippi, the Supreme Court reversed the defendant's death sentence because a prior conviction that had been used as an aggravating circumstance was overturned after the defendant had been sentenced to death. The Court explained that because the prior conviction was reversed, the defendant must be presumed innocent of that charge "unless and until the [defendant] shall be retried." Johnson v. Mississippi, supra, 486 U.S. at 585.

Here, fears that the jury's finding of Defendant's guilt of the charged gang-related double-murder would influence its ability to fairly determine whether Defendant had committed a previous uncharged gang-related double-murder turned out to be well-founded. In its closing argument, the government tacitly acknowledged the weakness of its evidence and the government's reliance on the guilt phase verdict for convincing the jury that Defendant had committed the Fairfax Avenue double-murder: (1) "Does that story sound familiar? Oh, you disrespected me and I pulled out a gun. Sure it sounds familiar because that's exactly what happened later in Greensboro" (April 27 transcript, page 829); (2) "This is what happened. And man, he went off. Sound familiar? They flipped off the gang and he went off. And he froze them. Just like he did in Greensboro. That's a consistency you need to consider" (April 27 transcript, page 894); (3) "His friend Jose Herrera turned to run and he was shot square in the back of the head. Somebody had the presence of mind. This wasn't a wild, reckless shooting. This was deadly and on point. What happened in Greensboro? Right through the middle of the chest." (April 27 transcript, page 895). Thus, Defendant's right to the presumption of innocence on the unadjudicated murders was violated when the jury was told by the government that Defendant must have committed the unadjudicated murders in Los Angeles because he committed the Greensboro murders in the same manner.

Therefore, in the present case, admission of evidence of alleged murders that had not resulted in convictions against Defendant during the penalty phase of this capital trial denied him Due Process of law during the sentencing phase and violated his presumption of innocence on these untried charges. Defendant also submits that admission of evidence of these unadjudicated murders violated 18 U.S.C. Section 3593(c) by unfairly

prejudicing Defendant in that it permitted the jury to rely on evidence lacking indicia of reliability after it has already adjudged him guilty of capital murder. Therefore, Defendant submits that he is entitled to a new trial on the sentencing phase where admission of such evidence will not be allowed.

5. **THE PENALTY PHASE VERDICT FORM COVERING THE NON-STATUTORY AGGRAVATING FACTOR OF FUTURE DANGEROUSNESS FAILED TO PROVIDE FOR THE JURY TO ACTUALLY FIND THE NON-STATUTORY AGGRAVATING FACTOR OF FUTURE DANGEROUSNESS.**

The Government's death notice was filed on September 23, 2008. In it the Government alleged identical statutory and non-statutory aggravating factors for each of the four capital counts. For each capital count under non-statutory aggravating factors the Government alleged, as the fifth non-statutory aggravating factor, future dangerousness. The Government specifically alleged that future dangerousness was evidenced by four subcomponents: a continuing pattern of violence, low rehabilitative potential, lack of remorse, and gang membership.

In the special verdict form submitted to Defendant's capital jury, the trial court submitted the issue of future dangerousness to the jury in written form as follows:

> 4. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant is likely to commit criminal acts of violence in the future which would constitute a continuing and serious threat to the lives and safety of others, as evidence by at least one or more of the following:
>
> a. The defendant has engaged in a continuing pattern of violence, attempted violence, and threatened violence, including but not limited to the crimes alleged against the defendant in the Indictment.
>
> Yes:_____          No:_____
>
> _____

FOREPERSON

b.      The defendant poses a future danger to the lives and safety of other persons as demonstrated by his lack of rehabilitation after incarceration, his pattern of criminal conduct, and his allegiance to and membership in MS-13?

Yes:_____          No:_____


_____
FOREPERSON

c.      The defendant has never expressed any remorse for killing Ruben Garcia Salinas as indicated by defendant's statements to fellow gang-members during the course of and following the offenses alleged in the Indictment?

Yes:_____          No:_____


_____
FOREPERSON

d.      The defendant has demonstrated an allegiance to and active membership in MS-13, a violent criminal enterprise?

Yes:_____          No:_____


_____
FOREPERSON

While the verdict form submitted to the jury allows the jury to make a factual finding regarding the four subcomponents of future dangerousness, it does not permit the jury to make a specific conclusion that the Defendant "is likely to commit criminal acts of violence in the future."  Hence, the jury has never made an actual determination that the Defendant poses a future danger.  Regretfully, the Court's instructions to the jury did not clarify this issue for the jury.  The Court's instructions mirrored the special verdict

14

form and never informed the jury that they had to determine whether the Defendant presented a future danger in order to find the non- statutory aggravating factor. The Court's instruction is set out here.

> Four, future dangerousness. Defendant is likely to commit criminal acts of violence in the future which would constitute a continuing and serious threat to the lives and safety of others as evidenced by at least one or more of the following:
>
> (A), continuing pattern of violence. Defendant has engaged in a continuing pattern of violence, attempted violence and threatened violence including but not limited to the crimes charged against the defendant in the indictment.
>
> (B), low rehabilitative potential. Defendant poses a future danger to the lives and safety of other persons as demonstrated by his lack of rehabilitation after incarceration, his pattern of criminal conduct and his allegiance to and member in MS 13.
>
> (C), lack of remorse. Defendant has never expressed any remorse for killing Ruben Garcia Salinas and Manuel Garcia Salinas as indicated by defendant's statements to fellow gang members during the course of and following the offenses alleged in the indictment.
>
> (D), gang membership. Defendant has demonstrated an allegiance to and an active membership in MS 13, a violent criminal enterprise.

April 27 Transcript, pp. 906-7. The special verdict form submitted to Defendant's jury did not require the jury to determine whether Defendant constituted a future danger. Given that the court's instructions did not clarify this for the jury, the Court must conclude the Defendant was sentenced to death based on an insufficient verdict form which allowed Defendant's jury to make factual findings regarding his conduct yet not reach the ultimate conclusion as to the existence of an aggravating factor. Accordingly, the Defendant is entitled to a new sentencing hearing.

**6.  THE COURT'S EXCLUSION OF AN INTERVIEW OF DEFENDANT'S MOTHER PREJUDICED DEFENDANT'S PRESENTATION OF HIS CASE IN MITIGATION.**

During the sentencing hearing, Richard McGough testified that, while the trial was proceeding, Defendant had received through discovery a copy of a birth certificate from the Government indicating the Defendant had been born in Guatemala.  This birth certificate showed Defendant's date of birth preceded his previously known date of birth by two years.  The birth certificate also showed that Defendant was not born in El Salvador as had previously been believed, but had actually been born in Guatemala.  The birth certificate was received along with another document that contained a narrative, written in Spanish, which summarized an interview of the Defendant's mother, Leticia Diaz Ramirez, by Salvadoran police.  The Court excluded Defendant's presentation of this narrative from evidence.

Defendant made an offer of proof of the narrative.  The narrative stated that Defendant's mother had been interviewed on June 14, 2008 by Carlos Alberto Moreno. She stated that the Defendant's father, at the time of the Defendant's birth, had moved the family to an area called La Parrillada located in Guatemala.  The Defendant's father moved his grandmother, his mother and an aunt named Carmen all to this location which is where Defendant was born.  She further describes the Defendant was born in the National Hospital of Escuintla on the 25th of November 1982 at 11:30 a.m.  The birth certificate reports that the Defendant's father is Luis Armando Gonzalez.  His mother explains that Rafael Umana, Defendant's father, actually registered the birth but that he used the name of his cousin in registering his birth as the father of the Defendant.

This narrative was important to the Defendant's case in mitigation in a variety of ways. The Defendant presented evidence that he was born in El Salvador during the violent civil war of the 1980s and early 1990s. The evidence demonstrating that the Defendant's family was moved to Guatemala during this time corroborates that his family was displaced by the violence that was going on in El Salvador. The fact that Defendant's father was required to move his entire family to Guatemala due to the civil war is mitigating evidence that Defendant's jury should have heard. The fact that Defendant's father falsified the name on the Defendant's birth certificate is also important evidence that Defendant's jury should have heard. It was consistent with Defendant's presentation of evidence showing Defendant's father as non-cooperative with defense counsel's investigation of Defendant's background and was significant to an understanding of the Defendant's father's role in his life.

7.     **THE ADMISSION OF DEFENDANT'S APRIL 23, 2008 STATEMENT MADE TO LOS ANGELES POLICE DETECTIVES VIOLATES DEFENDANT'S FIFTH AND SIXTH AMENDMENT RIGHTS.**

Defendant acknowledges that he has previously filed a Motion to Suppress his April 23 statement (document 490) and that the Court denied that motion after conducting an evidentiary hearing on August 26, 2009. Defendant asks the Court to re-examine this issue as a motion for a new sentencing hearing, citing further facts and authorities which support his contention that defendant's Constitutional rights were violated requiring the exclusion of this statement from Defendant's sentencing hearing.

Defendant was arrested and charged with two counts of first degree murder in state court proceedings on December 12, 2007. On December 14, 2007, in state court proceedings, the Defendant specifically requested the appointment of counsel on these

17

homicide charges (see Exhibit A, p. 1, affidavit of indigency)[1]. The Honorable Linda L. Falls, presiding at this proceeding, found that the Defendant was charged with first degree murder, that he was not financially able to provide for his own legal counsel, and ordered he was entitled to the services of counsel (see Exhibit A, p. 4, order of determination of counsel). On December 19, 2007, the North Carolina capital defender, Robert M. Hurley, appointed John D. Bryson as Defendant's legal counsel (see Exhibit A, p. 5, assignment of counsel). Guilford County jail records demonstrate that John Bryson met with the Defendant on December 21, 2007 and then on four more occasions prior to the arrival of the Los Angeles detectives at the jail on April 23, 2008 (see Exhibit A, pp. 6-11, jail records). Bryson also retained the services of Richard McGough, who would later testify at Defendant's sentencing hearing as a mitigation specialist. Guilford County Jail records reflect that McGough met with Umana on February 8, 2008, also prior to the arrival of the Los Angeles detectives (Exhibit A, p. 11, jail record).

Los Angeles police detectives arrived at the Guilford County Jail in High Point on April 23, 2008 and interviewed Defendant regarding allegations of his involvement in three homicides in California from the year 2005. John Bryson did not receive prior notification of the interview by the Los Angeles detectives (August 26, 2009 Transcript, p. 67).

Defendant will not set out his entire claim again as it is contained in his original Motion to Suppress and supporting Memorandum of Law (Documents 490 and 491). However, in addition to the foregoing additional facts showing the Defendant had requested counsel on these homicides, had received counsel, and that counsel and

---

[1] The third page of the Affidavit of Indigency contains the Defendant's statement made under penalty of perjury: "I now request the Court to assign a lawyer to represent me in this case."

Defendant were actively engaged in the course of legal representation, Defendant would also submit additional authority supporting his claim.

The United States Supreme Court has recognized that when the prosecution in a capital case attempts to interview a defendant regarding evidence of future dangerousness, both the defendant's Fifth and Sixth Amendment rights are implicated. *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L. Ed. 2d 359 (1981), *Satterwhite v. Texas*, 486 U.S. 249 (1988); *Powell v. Texas*, 492 U.S. 680, 109 S.Ct. 3146, 106 L. Ed. 2d 551 (1989). While these cases deal specifically with psychiatric examinations, the decisions clearly require notice to defense counsel when the client is to be interviewed regarding issues that would "encompass the issue of their client's future dangerousness." The Court has consistently ruled that the failure to notify defense counsel of such an interview violates the defendant's Sixth Amendment right to counsel. Here, while the Los Angeles police detectives came to interview the defendant regarding other crimes having occurred in California, this was nevertheless an interview in which the defendant was to be questioned about evidence that would be used in his capital sentencing hearing on his future dangerousness. Accordingly, applying the rule of *Estelle v. Smith*, defense counsel was entitled to notification of the interview. The failure to notify Defendant's attorney violates defendant's Sixth Amendment right to counsel. This violation requires the suppression of the statement. Given that the statement was admitted in evidence during sentencing, Defendant is entitled to a new sentencing hearing.

Responding to Defendant's original Motion to Suppress alleging a Sixth Amendment violation, the Government relied almost exclusively on *McNeil v. Wisconsin*, 501 U.S. 171 (1991). However, *McNeil v. Wisconsin*, 501 U.S. 171 (1991) is clearly

distinguishable from the instant case. Defendant acknowledges *McNeil* holds that a defendant's Sixth Amendment right is case specific and that having a lawyer in one case doesn't prevent the police from interviewing a defendant regarding another crime. However, in *McNeil*, the Court dealt with the admissibility of the defendant's statement in the prosecution of the crimes to which the statement related and to which the defendant was not represented by counsel at the time of the statement. Here, unlike *McNeil,* Defendant's statement was introduced in the case in which the Defendant was represented by a lawyer at the time of the statement. Defendant would agree that *McNeil* holds that defendant's April 23, 2008, statement would otherwise be admissible in future prosecutions against him in the state of California. However, *McNeil* does not address the facts of this case where the statement is introduced at the sentencing hearing in the case in which the defendant was represented by counsel at the time the interview took place. Here, Defendant's lawyer was actively representing him at the time of the interview and yet he received no notice of the interview, the contents of which would be used to support Defendant's sentence of death.

Additionally, Defendant's case is distinguishable from *Montejo v. Louisiana*, 129 S.Ct. 2079 (2009). In *Montejo*, while the defendant had been appointed counsel, he had not requested counsel.

> When a court appoints counsel for an indigent defendant in the absence of any request on his part, there is no basis for a presumption that any subsequent waiver of the right to counsel will be involuntary. There is no "*initial* election" to exercise the right, *Patterson,* 487 U.S., at 291, 103 S. Ct. 2389, 101 L. Ed. 2d 261, that must be preserved through a prophylactic rule against later waivers. No reason exists to assume that a defendant like Montejo, who has done *nothing at all* to express his intentions with respect to his Sixth Amendment rights, would not be perfectly amenable to speaking with the police without having counsel present. And no reason exists to prohibit the police from inquiring. *Edwards* and *Jackson* are

meant to prevent police from badgering defendants into changing their minds about their rights, but a defendant who never asked for counsel has not yet made up his mind in the first instance.

Montejo at 2086-7. Additionally, Montejo had never met with his attorney at the time he was interviewed by police. Here, Defendant had not only requested the appointment of counsel, he had received counsel and had been working with counsel for a period of months at the time he was interviewed by police.

Additionally, the Los Angeles detectives provided Defendant with standard Miranda warnings.

> You have the right to remain silent. If you refuse the right to remain silent, whatever you say can be used against you in a court of law. You have the right to speak with a lawyer and have a lawyer present at any interview. If you so desire and don't have the money to pay for a lawyer, a lawyer will be obtained for you at no cost before any interview. . . if you. . .so wish. Do you understand what I explained to you?

April 23, 2008 statement, p. 19. These Miranda warnings were insufficient for Defendant to waive his Sixth Amendment right to counsel under the facts of this case. The Miranda warnings provided by the Los Angeles police detectives only advised Defendant that he could receive a lawyer and did not advise him that detectives would contact his lawyer regarding the statement. This is significant in that the Defendant had told the detectives that he did not want to do anything that would affect his North Carolina case.

Additionally, on the issue of waiver of his Sixth Amendment right to counsel, Defendant notes that the Los Angeles police detectives, prior to reading Defendant his Miranda rights, told Defendant that he would not be leaving North Carolina and therefore, had nothing to lose by speaking with them. Prior to reading Defendant his Miranda rights, the Los Angeles detectives informed Defendant that they had consulted

with North Carolina authorities and had reviewed the statement that he made to North

Carolina law enforcement regarding the murders for which he was being prosecuted.

> CARSHELL: He knows that we spoke to him about his current thing and. . .
>
> FLORES: Right.
>
> CARSHELL: and. . . and, and we've reviewed his interview and that he. . . you know. . .
>
> FLORES: Yeah, [UI] understand…

April 23, 2008 statement, p. 16. Shortly thereafter, detectives informed Defendant that he

would never be leaving North Carolina.

> CARSHELL: We just wanna. . ., we just wanna, you know, have him just clean, clean the slate here, I mean, you know, if he's gonna stay here on this. You know, it sounds like he's gonna stay here on this and, you know, we don't wanna bother him or anything but. . .
>
> FLORES: Yes, mm-mm. . .
>
> CARSHELL: . . . let's clear some stuff up in the past, uh. . .
>
> FLORES: What he wants to verify is. . .there are things that happened in the past, and that, well, that's in the past, but, uh. . .there are many things that we want to clarify. We know that you're here, and well, you know [UI] that you're going to stay here. Understand? [UI] in New York where perhaps you want to. We don't. . .don't know, but it's your. . . those things can be talked about. . .right?

April 23, 2008 statement, p. 17. And, finally, before reading Defendant his rights, the

Los Angeles detectives also advised Defendant that he had nothing to lose by speaking

with them.

> FLORES: But they are things that. . .[UI] we have to resolve to get that weight off ourselves.
>
> AU: Yes.

FLORES:     Right?  And so. . . a composition [PH], [UI], well, it
            doesn't cost you anything.  Right?  So. . .

April 23, 2008 statement, p. 18.  That Defendant was to receive a life sentence in North

Carolina and, therefore, had nothing to lose by speaking with the Los Angeles police

detectives was something that would be repeated to him throughout the interview.  The

cited portions all occurred prior to the detectives reading the Defendant his Miranda

rights, and therefore, taint any waiver of his right to counsel.  Defendant's April 23, 2008,

statement was taken in violation of his Fifth and Sixth Amendment rights.   The

introduction of that statement at his sentencing hearing requires Defendant be granted a

new sentencing hearing.

8.    **THE ADMISSION OF THE TESTIMONY OF FRANK FLORES VIOLATES THE DEFENDANT'S RIGHT TO CONFRONT AND CROSS EXAMINE WITNESSES, AND CONSTITUTES BOTH HEARSAY AND EVIDENCE INADMISSIBLE UNDER RULE 404(b).**

Defendant acknowledges that he has previously raised, by a Motion In *Limine,*

[Document 962] his request to exclude the testimony of Frank Flores on the grounds that

it would constitute hearsay, violate Defendant's right to confrontation and that it would

be inadmissible under *Daubert v. Merrell Dow, Pharmaceuticals, Inc*., 509 U.S. 579

(1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).  The Court denied

Defendant's motion by order filed April 9, 2010 [Document 981].  However, Defendant

now cites to a critical portion of Detective Flores' testimony in support of Defendant's

claim that his testimony was inadmissible hearsay in violation of Defendant's right to

confrontation.  Additionally, Defendant notes this testimony constitutes specific factual

occurrences from his prior experience as a law enforcement officer, admitted in violation

of Rule 404(b).

23

During the direct testimony of detective Flores, the government sought to have Flores testify regarding his prior experiences rather than giving his expert opinion on the aspects of the case.

> Q:     Well, have you had, in your experience has there been any situations where a civilian has been killed out of disrespecting the gang?
>
> A.     Yes, I mean –
>
> MR. BRYSON:     Object.
>
> THE COURT:     Hang on a second.   I'll overrule the objection.
>
> THE WITNESS:     Violence is generally very common.   A lot of things happen unplanned or may happen on very short notice.
>
> Disrespect, somebody is confronted, they react.   Yes, they're required to act appropriately, whether confronted or disrespected by rival gang member, by somebody from the general public who they have taken some kind of disrespect from.   It's part of the normal, everyday activities.

April 12 Transcript, p. 63.

This testimony was a critical response in the Government's case.   The Government was attempting to prove that Defendant committed the killings to increase his position in the gang.   It was the Government's theory that Defendant committed the murders to increase his reputation in the gang, thereby increasing his position in the gang. The above-quoted testimony supported the Government's theory of the case.   However, the Government was not eliciting expert testimony from the witness regarding the rules of MS-13, but instead, was simply having him repeat prior experiences that had occurred to him.   This type of evidence is inadmissible character evidence under Rule 404(b). Nevertheless, this court overruled counsel's objection, and allowed the witness to testify as to prior cases and experiences that he had involving situations where civilians had

been killed for disrespecting a gang member. Federal Rule of Evidence 404(b) provides that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. *United States v. Weaver*, 282 F.3d 302 (4th Cir. 2002). The sole reason for admitting this evidence of other crimes that occurred in California was to show that the Defendant acted with the same motivation as other gang members had acted in other crimes. This is the exact type of evidence that Rule 404(b) is meant to exclude. Defendant again renews his challenge to the testimony of Frank Flores as hearsay testimony which violates the Defendant's right to confrontation. Defendant asserts that Flores' testimony is essentially based on prior cases and prior conversations that he has had with other gang members and is not the type of expert testimony contemplated by Rule 703 of the Federal Rules of Evidence.

**9. THE GOVERNMENT'S SENTENCING REBUTTAL ARGUMENT WAS DESIGNED TO INFLAME THE JURORS' EMOTIONS AND PASSIONS AND WAS OTHERWISE IMPROPER.**

The government's rebuttal argument during the sentencing phase contained numerous instances where the government made statements that were designed to inflame the emotions and passions of the jury in order to obtain a death sentence or were otherwise improper.

The government, after successfully objecting to Defendant's discovery motion seeking data from the Bureau of Prisons regarding the behavior of MS-13 members in prison, argued the following: "There are only 240 MS-13 members in prison. And I can promise you that if one of them was there for life and was behaving, we would have heard all about it." (April 27 transcript, page 888). This was unfair, misleading, and

prejudicial because the defense had been disabled from obtaining such information by the government's successful objection to Defendant's discovery motion.

The government, after successfully objecting to Defendant's offering of the mitigating factor that "no other defendants who committed gang-related murders as part of this conspiracy will receive the death penalty", argued the following:

> So let's compare him to the people around him and quit taking him out and separating him and looking at him as if he is only this way because of factors. He's here because of who he is. And he's a killer. He's shown it over and over and over again. And he's a killer among killers. They talk about killing, yeah. But we haven't had any evidence of it. And of all the people that were around him, he was the killer. He rose to the top as the killer.
> So, yes. Is MS bad? Sure is. We've put on a lot of evidence about that. Are they violent? Yes. But of everything you've heard from all the people you've heard about from both sides and all their cross-examination, he's the only killer. So you remember that. Compare that. (April 27 transcript, page 889).

Not only did the government unfairly take advantage of the Court's ruling excluding the defense mitigating factor, but argued to the jury that Defendant was the only killer among the MS members involved in this case, which is simply untrue. The evidence showed that the following MS-13 members who were involved in this case had committed murder: (1) Codefendant Johnny Gonzalez, AKA Solo, was one of two perpetrators of a robbery-murder in August, 2005; (2) Rony Lopez, a cooperating MS-13 witness for the government, was an aider and abettor of that robbery-murder and would thus be criminally liable for murder in North Carolina. Additionally, the indictment charged codefendant Elvin Pastor Fernandez-Gradis AKA "Tigre" with murder, of which he was convicted in January, 2010. Thus, the government's argument that Defendant was the only MS member that committed murder was misleading, untrue, and prejudicial to Defendant. Defendant's attorneys again objected at sidebar to the exclusion of their

proposed mitigating factor and also objected to the government's argument that Defendant was the only MS murderer. (April 27 transcript, p. 914). Because the improper argument was not remedied, Defendant submits that a new sentencing phase of trial is required.

The government argued that one of the aggravating factors was "callous disregard" and that is was "a reason to weigh in favor of death." (April 27 transcript, page 896-897). Defendant's counsel immediately objected and the Court instructed the jury to disregard the statement because the Court had previously stricken this as an aggravating factor. Nevertheless, Defendant submits that this statement, in conjunction with the other arguments cited herein, combined to inflame the jury with emotion and passion to the prejudice of Defendant, requiring a new sentencing trial.

The government argued that Defendant "comes to court with a shank". (April 27 transcript, page 898). In truth, the evidence showed that Defendant was found with a shank at the jail before being transported to the courthouse, and never brought a shank to court. The government went on further to argue that he brought the shank to court to "fight off rivals" and then argued as follows: "You know who the rivals were? They're the marshals. Those are his rivals. The judge is his rival. I'm his rival. Anybody in this courtroom is a rival. You're his rival. He brought it on the first day of jury selection." (April 27 transcript, page 899). Again, not only did the government again incorrectly state that Defendant brought the shank into the courthouse, the government sought to improperly inflame the jury with fear and passion by claiming, without evidentiary support, that Defendant was a potential threat to the jurors themselves. Although Defendant's attorneys immediately objected and the Court sustained it, the government

continued in its effort to create feelings of fear and hostility towards Defendant from the jury, arguing that "[W]e're rivals . . . [b]ecause we stand for justice." (April 27 transcript, p. 899).

The government also appealed to anti-immigrant beliefs, appearing to try to exploit jury animosity towards Defendant based on his ethnicity and national heritage when it argued as follows:

> You want to live the crazy life? You need to be ready for some
> American justice. You want to bring El Salvador here, you want
> to bring your gang from El Salvador here, you want to kill us,
> you want to live your crazy life here, well, you'd better be ready
> for some American justice if you're going to do it.
> And that's why you're here. (April 27 transcript, p. 899).

Defendant submits that such argument was likely to create the risk of a death verdict based on Defendant's ethnic and national origin in violation of Fifth Amendment Equal Protection, Eighth Amendment protection against cruel and unusual punishment, and the anti-discrimination provision of the Federal Death Penalty Act, 18 U.S.C. §3593(f).

The government also argued during its sentencing rebuttal argument that the jury should, through its death verdict, send a message to MS-13:

> You tell them—you think MS is listening? You think they're
> watching? What are they going to say when all this is over?
> When you've made your decision? Justice in this case is not
> prison. (April 27 transcript, p. 899).
>
> . . . .
>
> Do not by your verdict be the water that washes the blood from
> his hands. Don't let him live the crazy life. You send him a
> message. You send the community a message. You send MS
> a message because they're listening and they're watching.
> (April 27 transcript, p. 904).

The Court, sua sponte, instructed the jury that in determining what sentence to impose, it should not consider any message that might be sent by its verdict. (April 27 transcript, pp. 916-918). However, Defendant submits that such repeated argument was likely to cause the jurors to return a death verdict to deter MS-13 crimes rather than as an individualized sentence appropriate for this Defendant.

Further, the government argued sympathy for the victims' families as a basis for imposing the death penalty:

> So we have Carmen and Betsy, two young girls who came
> in here and poured their hearts out to you. Think about those
> girls. So you can say to Carmen and Betsy when you look
> at them out there, we saw your pain and we felt your sorrow and
> we heard your grief. I want you to put their tears on that scale,
> that weighing that you're going to do, put that on your scale.
> (April 27 transcript, p. 902).

Such an argument improperly asks the jury to impose the death penalty out of sympathy or revenge as opposed to a proper weighing of factors to determine a sentence individually appropriate for this Defendant.

Finally, the government argued that the rights Defendant would have as a federal inmate in the Bureau of Prison are a reason to impose the death penalty:

> The defendant, if you give him life, is going to have his inmate
> bill of rights. I read them out to Dr. Cunningham.
> He took lives. Are you going to give him his bill of rights? Manuel
> and Ruben didn't have a bill of rights. They didn't have a thought,
> they didn't have a chance. You going to give him his bill of rights?
> And all the benefits that come with it. You heard them all.
> If his life in El Salvador was as bad as they painted it, prison looks
> good. It's clean. Dental, healthcare, meals, the commissary. Like
> Dr. Cunningham said, if he's good—he's going to be good. You know
> why? Because he wants to make sure he gets his beans and potato
> chips.
> You going to send him to the commissary? I want you to weigh that
> bill of rights that Manuel and Ruben didn't have but that you're going
> to give him. Is that justice? Is that justice? Is that justice?

. . . .
Manuel and Ruben, . . . they're a corpse and you're going to send him
to the dining hall.  Is that justice?
Are you going to send him to the recreation yard?  Are you going to let
him step outside and talk to his homies?  Is that justice?  He's going to
see sunshine.  He's going to watch the sunset.  He's going to see flowers.
He's going to feel spring breezes.  Is that justice?  (April 27  transcript,
902-903).

Such an argument is an improper reference to Defendant's exercise of

constitutional and other rights.  Additionally, to argue that it is not justice for Defendant

to live while the victims are dead "creates a *super-aggravator* applicable in every death

case.  No amount of mitigating evidence can counter this argument, and if the jury agrees

they may not even consider mitigating evidence."  *Le v. Mullin*, 311 F.3d 1002, 1015

(10th Cir. 2002) (citations omitted) (emphasis in original).  In the *Le* case, the prosecution

had argued as follows:

[Y]ou can sentence [the defendant] to life or life without parole.  . . .
He'll be well-cared for, well-fed.  What about [the victim]?
. . .
Ladies and gentlemen, justice needs to be done in this case.  Defense
counsel asked you to sentence a punishment of life imprisonment or
life without parole, but do you really think that justice would be done
if this man goes to prison, gets three meals a day and a clean bed
every night and regular visits from his family while [the victim] lays
cold in his grave[?]

*Id.*, at 1014-1015.  The Tenth Circuit Court of Appeals found this argument to be an

improper emotional appeal to impose death out of sympathy for the victims and that it

over-emphasized the inevitable permanency of the victim's death while possibly

encouraging the jury to disregard mitigating factors.  *Id.*, at 1016.  The Court of Appeals

stated that "a hallmark of a fair and civilized justice system" is that "verdicts be based on

reason, not emotion, revenge or even sympathy."  *Id.*, at 1015.

The case of *United States v. John Johnson*, 2010 WL 2010476, __ F.Supp.2d __ (E.D.La.), is instructive as the District Court in that case was faced with a motion for a new capital sentencing hearing based on, *inter alia*, improper government argument during the sentencing phase. Many of the same types of arguments were made by the government in that case as were made by the government in the rebuttal sentencing argument in this case. The court found that the government's rebuttal argument comparing the circumstances of life imprisonment with the permanency of the victim's death "was clearly an improper appeal to the emotions of the jury and their sympathy for the victim and the victim's family in this matter." The court stated that such argument also encourages the jury to disregard mitigation evidence. In conjunction with other improper rebuttal arguments made by the government at the sentencing hearing, the court granted a new penalty phase hearing. *Id.*, at p. 34.

The court in *Johnson* found three separate and independent improper arguments by the government:

> (1) the emotionally inflammatory directive to the jury that a verdict of life imprisonment would mean that they valued the life of the defendant above that of the victim; (2) the emotionally inflammatory appeal to sympathy for the victim and the victim's family by comparing the life of the defendant in prison to the permanency of the victim's death; and (3) the emotionally intimidating pressure imposed upon the jury to bring in a verdict of death on behalf of the Zaffuto family or else be perceived as capitulating, lacking in will, and "washing the blood" from the defendant's hands.

*Id.*, at 37. Similarly, in this case the government's sentencing rebuttal argument was an improper emotional and inflammatory appeal to impose the death penalty based on sympathy, revenge, and a comparison of the life of Defendant in prison to the permanency of the victims' deaths and their loved ones' grief. Therefore, Defendant

submits that his constitutional rights were violated and a new sentencing hearing is required.

10.    **DEFENDANT WAS DENIED DUE PROCESS AND HIS MIGITATION CASE WAS UNFAIRLY PREJUDICED BY THE EXCLUSION OF DEFENDANT'S PROPOSED MITIGATING FACTOR OF EXECUTION IMPACT ON DEFENDANT'S FAMILY.**

Among the mitigating factors on which Defendant sought instruction to the jury during the sentence selection phase was the following: "14.  The execution of Alejandro Enrique Umana would cause grief and loss to his son Rafael and to Monica Reyes."  (See Defendant's Request for Instruction on Mitigating Factors filed 4/27/10, Document 1024).  The government objected to this mitigating factor and the Court ruled against Defendant, striking it as a mitigating factor.  However, Defendant submits that this is a valid mitigating factor and that its exclusion denied Defendant due process during the sentence selection phase.

During the sentencing selection phase, Defendant presented testimony from Richard McGough, Defendant's court-appointed mitigation investigator, regarding Defendant's life in El Salvador, which included information about his young son Rafael and his son's mother, Monica Reyes.  A videotaped interview of Monica Reyes was played.  In the interview, she was seated next to her son Rafael and expressed her feelings about Defendant, from which it was apparent that she and Rafael deeply cared for Defendant and that the execution of Defendant would cause them grief and suffering.  However, the Court's striking of the execution impact mitigating factor prevented the jury from considering this as a reason for giving the Defendant life without parole rather than execution.

Defendant submits that execution impact evidence is circumstantial evidence of Defendant's character and was thus properly admitted by the Court during the sentencing selection phase. However, the Court's denial of execution impact as a mitigating factor violates Defendant's right to Due Process, the Eighth Amendment, and the Federal Death Penalty Act.

A defendant is entitled to present evidence about the grief and loss his family would suffer if he were executed under two well-established constitutional rules governing the admissibility of mitigation in capital cases. The first is that the Eighth Amendment "requires . . . the sentencer not be precluded from considering . . . any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Skipper v. South Carolina*, 476 U.S. 4, 6 (1986), *quoting Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982). The second, corollary rule, is "that the sentencer may not . . . be precluded from considering 'any relevant mitigating evidence'." *Skipper*, *supra*, 476 U.S. at 6 (quoting *Eddings*, 455 U.S. at 14). Of course, "relevant" means having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." *Tennard v. Dretke*, 542 U.S. 274, 284 (2004) (quotation omitted); Fed.R.Evid. 401. A fact of consequence is simply one the sentencer "could reasonably deem to have mitigating value." *Tennard*, 542 U.S. at 284. Thus, this "low threshold," *Id.*, licenses any evidence from which the sentencer "could . . . draw[] . . . inferences" about the defendant or the crime that "might serve as a basis for a sentence less than death." *Skipper*, 476 U.S. at 6 (quotation omitted).

The Federal Death Penalty Act tracks this broad standard and arguably broadens it further. At a sentencing hearing, "[t]he defendant may present any information relevant to a mitigating factor," without being constrained by the Rules of Evidence. 18 U.S.C. §3593(c). The Act lists eight factors, including a catch-all of "other factors in the defendant's background, record or character or any other circumstance of the offense that mitigate against imposition of the death penalty." Another listed factor, that an equally culpable codefendant will not receive the death penalty, has nothing to do with the defendant or of the offense. *See* 18 U.S.C. §3592(a)(4). Additionally, the preface to the statute suggests that the seven specific factors and the one catch-all factor are not exclusive, and that a capital defendant can rely on additional mitigating factors. *See* 18 U.S.C. §3592(a) (directing sentencer to "consider any mitigating factor, *including the following* . . . ") (emphasis added). Finally, Section 3593(c) provides that "information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592").

Accordingly, a number of courts have held that the FDPA requires that the fact finder consider any mitigating factor, including those other than the defendant's character and record and the circumstances of the offense. *See, e.g., United States v. Caro,* 433 F.Supp.2d 726, 727-28 (W.D.Va. 2006); *United States v. Bodkins*, 2005 WL 1118158 *8 (W.D.Va May 11, 2005); *United States v. Sampson*, 335 F.Supp.2d 166, 194-95 (D.Mass. 2004); *United States v. Bin Ladin*, 156 F.Supp.2d 359, 370 (S.D.N.Y. 2001); *United States v. Davis*, 132 F.Supp.2d 455, 464-65 (E.D.La. 2001).

Under these broad concepts of relevance, it is clear that if a defendant has been a loving father, brother, husband, etc. to his family and has established an emotionally

close relationship with them, this is a positive aspect of his character or background that constitutes a legitimate mitigating factor. *See, e.g., Porter v. McCollum*, 130 S.Ct. 447, 449 (2009) (noting mitigating evidence that the defendant had a "good relationship with his son"); *Williams v. French*, 146 F.3d 203, 207 n.3 (4th Cir. 1998) (noting mitigating factor that defendant "was a loving father").

Family members' indication that they would suffer grief and loss can help establish something circumstantially about the defendant's character and background: that he has demonstrated love and forged an emotional bond with them. From such evidence, a reasonable juror could legitimately conclude that family members love the defendant and feel a strong attachment to him, and that they do so because there is something positive about the relationship he has established with them. This analysis has led some courts to allow execution impact mitigating evidence. In *United States v. Mitchell*, 502 F.3d 931, 991 (9th Cir. 2007), the Court of Appeals held that the district court drew an "appropriate line" when "[it] allowed witnesses to testify regarding their affection for the defendant *and their wish for his life to be spared*, but did not allow them to offer an opinion about what they thought the jury's verdict should be." The former, ruled the Court, was "relevant mitigating evidence" because it "tended[ed] logically . . . prove" something about Mitchell's "record and character." *Id.*

Similarly, in *United States v. Fell*, 2005 WL 1634067 (D.Vt. July 5, 2005), the court refused to strike the mitigating factor "Donald Fell's execution would detrimentally affect persons who care about him." The court explained that this factor "may shed light on Fell's background and character," including his "positive qualities, his capacity to be of emotional value to others, and the nature of his interpersonal relationships." *Id.*, at *2.

The court rejected the government's argument that such mitigation would "invite the jury to consider sympathy for Fell's loved ones," which it agreed was not an appropriate factor. *Id.*; *see United States v. Wilson*, 493 F.Supp.2d 491 (E.D.N.Y. 2007) ("the sort of evidence the Government seeks to preclude, *i.e.,* how Wilson's family would feel if he were executed, may fairly be considered part of Wilson's "background"); *see also United States v. Rodriguez*, 2007 WL 466752 *43 (D.N.D. Feb. 12, 2007) ("The Court recognizes that execution impact evidence is relevant mitigating evidence under the Federal Death Penalty Act").

A decision by the Third Circuit Court of Appeals actually found defense counsel ineffective for failing to present execution impact evidence. That decision did not characterize the evidence as proof of the defendant's character, but rather deemed it independently mitigating. *See Marshall v. Cathel*, 428 F.3d 452, 470 (3rd Cir. 2005) (defense counsel should have interviewed and called to the stand each of the defendant's sons to "plead[] for the jury to spare his father's life"), *affirming* 313 F.Supp.2d 423, 456-57 (D.N.J. 2004) (highlighting counsel's failure to present mitigating evidence of the "harmful impact [defendant's] execution would have on his family, particularly his then fifteen-year old son").

Furthermore, excluding execution impact on the theory that it does not directly bear on the defendant's culpability flies in the face of well-established law and practice allowing aggravating evidence of a capital defendant's future dangerousness, which jurors may weigh even if it flows from factors outside his control and therefore irrelevant to his moral blameworthiness. *See Perry v. Lynaugh*, 492 U.S. 302, 324 (1989). In that sense, execution impact mitigation simply mirrors such aggravation: each calls upon

jurors to weigh how allowing the defendant to live in prison or executing him would affect those around him. It makes no sense to allow jurors to consider only one side of this equation (the likelihood that the defendant would harm fellow prisoners or guards) and not the other (the likelihood he would benefit his family). *See Jackson v. Dretke*, 450 F.3d 614, 620 (5th Cir. 2006) (Dennis, J., dissenting) ("Testimony that a defendant is beloved and valued by family and friends outside of prison is directly relevant to the question of whether he can lead a 'useful life' if sentenced to life imprisonment because it tends to show that other people consider the defendant valuable as a human being and would benefit from the defendant's survival.").

Indeed, the ABA Guidelines, a recognized standard for adequate representation in capital cases, instructs defense lawyers to consider calling "[w]itnesses who can testify about the adverse impact of the client's execution on the client's family and loved ones." *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases,* Guideline 10.11.F.4, *reprinted in* 31 Hofstra L.R. 913, 1056 (Summer 2003).

In this case, the government was allowed to present extensive, emotional victim family impact testimony towards establishing the following aggravating factor: "As demonstrated by each victim's personal characteristics as an individual human being and the impact of the death upon the victim and the victim's family and friends, the defendant caused injury, harm, and loss to the Ruben Garcia Salinas and Manuel Garcia Salinas family and friends." Yet, Defendant was prevented from presenting the jury with execution impact on his family as a mitigating factor. The admissibility of victim impact evidence totally undermines the theory that evidence regarding the defendant's family's

grief and loss suffered if he is executed tells the jury something about the family but nothing about the defendant. The core premise of allowing family members of a murder victim to testify about the grief and loss they suffered is that this illuminates the victim's unique individuality. The same must be true of execution impact testimony. Thus, to allow one to be an aggravating factor but not allow the other to be a mitigating factor violates fundamental fairness.

The Supreme Court has allowed victim impact evidence to avoid "unfairly weight[ing] the scales in a capital trial," where "virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." *Payne v. Tennessee*, 501 U.S. 808, 822 (1991). "The State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered an individual, so too the victim is an individual whose death represents a unique loss . . . in particular to his family." *Id.,* at 825.

Accordingly, some judges have recognized the contradiction in allowing such victim impact aggravation while at the same time preventing execution impact mitigation. *See, e.g., Jackson v. Dretke,* 450 F.3d 614, 621 (5th Cir. 2006) (Dennis, J., dissenting) (exclusion of execution impact was particularly unfair where "the State introduced potent evidence of the effects of the murders on the victims' relative"); *Wilcher v. State,* 697 So.2d 1123, 1144 (Miss. 1997) (Sullivan, P.J. and McRae, J., dissenting) ("I cannot agree with the majority that allows victim impact statements but does not allow a defendant's family to testify as to the impact upon them of the defendant's execution"); *State v. Rhines*, 548 N.W.2d 415, 446 (S.D. 1996) (analogizing execution impact to victim impact

and holding that both were properly presented below). Defendant submits that a double standard for victim impact and execution impact "unfairly weight[s] the scales", *Payne*, *supra,* 501 U.S. at 822, thereby violating Defendant's Due Process right to fundamental fairness and the Eighth Amendment.

Thus, here, where the government relied heavily on the impact of the victims' deaths on their families as an aggravating factor, it was fundamentally unfair to prevent the jury's consideration of the impact of Defendant's execution on his family as a mitigating factor. Therefore, Defendant submits that he is entitled to a new sentencing selection phase hearing where such mitigating factor would be allowed.

## 11.    CONCLUSION

For the above reasons, Defendant submits that he is entitled to a new trial on both the guilt and sentencing phases of trial and hereby respectfully requests this Honorable Court to grant his motion for new trial on both phases of the case.

Respectfully submitted,

June 14, 2010

s/ Mark P. Foster, Jr.
Attorney for Defendant
NC State Bar #22717
Law Offices of Mark Foster, P.C.
1011 E. Morehead Street, Suite 300
Charlotte, NC 28204
Phone 704-347-1809
Fax 704-332-2716
e-mail:  mpfosterjr@bellsouth.net


s/ John Bryson
Wyatt Early Harris Wheeler, LLP
1912 Eastchester Drive, Suite 400
High Point, NC 27261
336-819-6016
Fax 336-819-6076
jbryson@wehwlaw.com

39

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above **DEFENDANT'S MOTION FOR NEW TRIAL ON GUILT AND SENTENCING PHASES** has been duly served on the attorney(s) listed below by e-mail service through ECF on this date:

Jill Rose
Jill.Rose@usdoj.gov

Sam Nazzaro
Sam.Nazzaro@usdoj.gov

Adam Morris
Adam.Morris@usdoj.gov

June 14, 2010

s/ Mark P. Foster, Jr.
NC State Bar #22717
Law Offices of Mark Foster, P.C.
1011 E. Morehead Street, Suite 300
Charlotte, NC 28204
Pone704-347-1809
Fax 704-332-2716
E-mail: mpfosterjr@bellsouth.net

s/ John Bryson
Wyatt Early Harris Wheeler, LLP
1912 Eastchester Drive, Suite 400
High Point, NC 27261
336-819-6016
Fax 336-819-6076
jbryson@wehwlaw.com