IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:08-cr-134

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| ALEJANDRO UMANA (2) | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court upon motion of the defendant for a new trial (Doc.

No. 1103) and the government's response (Doc. No. 1147). For the reasons stated below, the

Court will **DENY** the defendant's motion.

I.      BACKGROUND

The defendant, along with 25 co-defendants, was charged with multiple federal offenses

arising out of his affiliation with La Mara Salvatrucha, also known as the MS-13 gang. (Doc.

No. 623: Third Superseding Indictment). Among other offenses, Count One charged the

defendant with a RICO conspiracy, in violation of 18 U.S.C. § 1962(d). The defendant was also

charged with the murders of Ruben and Manuel Salinas on December 8, 2007, in Greensboro,

North Carolina (the "Greensboro murders"), as overt acts in furtherance of the RICO conspiracy.

The Greensboro murders were charged separately in Counts Twenty-two and Twenty-four as

murders in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1), and in Counts Twenty-

three and Twenty-five as use of a firearm during and in relation to a crime of violence resulting

in death, in violation of 18 U.S.C. § 924(j). Counts Sixty-one, Sixty-two, and Sixty-three also

charged the defendant with conspiracy to commit obstruction of justice and witness tampering,

in violation of 18 U.S.C. §§ 371, 1503, and 1512(b)(1), as well as those substantive offenses. As

required by the Federal Death Penalty Act ("FDPA"), 18 U.S.C. § 3591 et seq., the government

gave notice of its intention to seek the death penalty for Counts Twenty-two through Twenty-five. (Doc. No. 275: Notice).

The defendant's case proceeded to a jury trial. With the exception of Count Sixty-two,[1] the jury returned a verdict on April 19, 2010, finding the defendant guilty of all offenses charged. (Doc. No. 1043: Verdict Form). After presentation of aggravating and mitigating evidence in a separate sentencing hearing that immediately followed, the jury returned verdicts recommending a sentence of death for each charge for which the government had sought it. (Doc. Nos. 1048-51: Penalty Selection Verdict Forms). The defendant has yet to be sentenced, but filed this motion after receiving an extension of time in which to do so.

The defendant raises a number of claims supporting his motion for a new trial, many of which were previously raised at some point during these proceedings. The defendant contends that the Court improperly instructed the jury on the elements of murder in the aid of racketeering; that there is insufficient evidence to support his conviction of witness tampering; that evidence of unadjudicated crimes was improperly admitted during the defendant's sentencing proceeding; that the penalty selection verdict forms did not include a finding that he was likely to commit acts of violence in the future; that the Court improperly excluded a police report summarizing an interview with the defendant's mother; that admission of the defendant's April 2008 recorded interview with law enforcement violated his Fifth and Sixth Amendment rights; that expert testimony given by Detective Frank Flores was inadmissible character

---

[1] The Court granted the defendant's Fed. R. Crim. P. Rule 29 motion with respect to the conspiracy's object to obstruct a federal investigation (Count Sixty-one) and the actual or attempted obstruction of a federal investigation (Count Sixty-two), in violation of 18 U.S.C. §§ 2, 371, and 1503. The Court found that the government had failed to prove that the defendant knew the investigation was a federal, not a state, matter. (Trial Tr. vol. V-A at 1133-1134, Apr. 16, 2010).

evidence; that the government's rebuttal argument at the conclusion of the defendant's sentencing hearing was improper; and that the Court improperly struck the defendant's proposed mitigating factor stating that his execution would cause grief and loss to his family.

## II.      LEGAL STANDARD

Upon motion of the defendant, a district court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).[2] A district court "'should exercise its discretion to award a new trial sparingly,' and a jury verdict is not to be overturned except in the rare circumstance when the evidence 'weighs heavily' against it." United States v. Smith, 451 F.3d 209, 217 (4th Cir. 2006) (quoting United States v. Perry, 335 F.3d 316, 320 (4th Cir. 2003)). The defendant, as movant, carries the burden of showing that the interest of justice requires a new trial.

## III.     DISCUSSION

### A.      Jury Instruction for Murder in the Aid of Racketeering

The defendant argues that he should be granted a new trial on Counts Twenty-two and Twenty-four because the Court failed to instruct the jury that in order to find him guilty of murder in aid of racketeering, he must have committed the murders to maintain or increase his own—not another's—position in MS-13. (Doc. No. 1103: Motion at 2). The applicable criminal statute reads, in pertinent part:

> Whoever, . . . for the purpose of . . . maintaining or increasing position in an enterprise engaged in racketeering activity, murders, . . . assaults with a dangerous weapon, . . . or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States [commits an offense].

---

[2]  The Court assumes without deciding that its authority to grant a new trial under Fed. R. Crim. P. 33(a) applies equally to the guilt phase of the defendant's trial and the sentencing hearing that followed.

18 U.S.C. § 1959(a). The Court gave the following instruction to the jury:

> In determining whether a person's purpose in committing the alleged murder, assault with a deadly weapon, or other crime was to maintain or increase position within the enterprise, you should give the words "maintain" and "increase" their ordinary meanings. You should consider all the facts and circumstances in making that determination. For example, you may consider evidence that the crime, if proved, was committed in order to maintain discipline within the enterprise and served to maintain position in the enterprise. If the defendant committed the crime because he knew it was expected of him by reason of his membership in the enterprise, or if he committed the crime because he thought it would enhance position or prestige within the enterprise, or if he committed it because he thought it was necessary to maintain the position already held, this element would be established. These examples are only illustrations.
>
> Conversely, it is not sufficient for the murder to be in furtherance of or consistent with the purposes of the enterprise. The defendant had to have had the conscious purpose to maintain or enhance position within the organization. The statute prohibits murders that are committed with the purpose of maintaining or enhancing a defendant's or another's relative position with the enterprise, vis-a-vis other members of the enterprise. In the absence of that specific prohibited purpose, a murder with the purpose of advancing a defendant's or the enterprise's reputation in the broader community is not covered by the statute.

(Trial Tr. vol. V-B at 1246-47, Apr. 16, 2010).[3] The defendant argues that the Court's instruction should have been drawn from Fourth Circuit precedents describing a defendant's purpose of increasing or maintaining "his" position in the enterprise as an element of the offense. United States v. Tipton, 90 F.3d 861, 891 (4th Cir. 1996); United States v. Fiel, 35 F.3d 997, 1004 (4th Cir. 1994) (both quoting United States v. Concepcion, 983 F.2d 369, 381 (2d Cir. 1992)).

Although these cases assumed that the position to be maintained or increased in the racketeering organization was the defendant's own, each addressed the sufficiency of evidence admitted at trial showing that to be the case. Neither held that violent crimes committed for the purpose of maintaining or advancing another's position in a racketeering enterprise would fall

---

[3] Transcripts of the guilt phase of the trial will be designated as "Trial Tr.," and transcripts of the penalty phase sentencing hearing will be designated as "Sent. Tr."

outside the scope of 18 U.S.C. § 1959(a). Moreover, the defendant cannot assign error to a jury instruction that accurately tracks the language of the applicable criminal statute. United States v. Wills, 346 F.3d 476, 494 (4th Cir. 2003); accord United States v. Williams, 299 F.3d 250, 258 (3d Cir. 2002); United States v. Wise, 221 F.3d 140, 152 (5th Cir. 2000). Thus, the defendant has not shown that the jury was improperly instructed on the elements of the offenses charged in Counts Twenty-two and Twenty-four.

B.     Witness Tampering Convictions

Next, the defendant claims the evidence was insufficient to support the jury's verdict on charges of conspiracy to tamper with witnesses (Count Sixty-one) and actual or attempted tampering with witnesses (Count Sixty-three), in violation of 18 U.S.C. §§ 2, 371, and 1512. (Doc. No. 1103: Motion at 5).

To sustain a conviction for conspiracy to commit witness tampering, the government was required to prove beyond a reasonable doubt: (1) that the defendant and at least one other person made an agreement to commit witness tampering; (2) that the defendant knew the unlawful purpose of the agreement and joined in it willfully; and (3) that one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the indictment, in order to accomplish some object or purpose of the conspiracy. United States v. Kingrea, 573 F.3d 186, 198 (4th Cir. 2009) (§ 371 elements).  Witness tampering is established if the government proves beyond a reasonable doubt: (1) that the defendant or co-conspirator used threats or intimidation against a person; and (2) that the defendant or co-conspirator acted knowingly and did so for the purpose of influencing, delaying, or preventing that person's testimony in an official proceeding. United States v. Thompson, 76 F.3d 442, 453 (2d Cir. 1996).

The defendant's claim centers on the allegation that only one witness linked him to the conspiracy which led to armed MS-13 gang members traveling to Greensboro, North Carolina to intimidate witnesses at the restaurant where the murders at issue were committed.[4] (Doc. No. 1103: Motion at 6). That witness was Alexander Granados, a.k.a. "Gorilon," an illegal alien from El Salvador who joined MS-13 in Boston, Massachusetts when he was sixteen or seventeen years old. (Trial Tr. vol. IV-A at 866-68, Apr. 15, 2010). He came to Charlotte, North Carolina in 2006 after being deported and became active with the gang here. (Id. at 873). After the defendant was arrested for the Greensboro murders, Granados attended a gang meeting led by "Misterio." According to Granados, Misterio told the group that the defendant told him that the defendant had a court date the following week and sent a message to Misterio so that "there won't be somebody speaking out at the court." (Id. at 890). He identified the types of handguns the group planned to carry, (Id. at 891), which were later found on the gang members in Greensboro after one of them went into the restaurant to intimidate the owner. (Trial Tr. vol. IV-B at 925-26, 948, Apr. 15, 2010).

The uncorroborated testimony of a single witness may be sufficient evidence of guilt, even if the witness is an accomplice, a co-defendant, or an informant. United States v. Wilson, 115 F.3d 1185, 1189-90 (4th Cir. 1997). Although no other participants in the meeting led by Misterio testified at the trial, details consistent with Granados's account were established by other evidence, such as the recovery of the guns in Greensboro. Counsel for the defendant cross-examined Granados about the defendant's alleged statement to Misterio. (Trial Tr. vol. IV-B at 915-17, Apr. 15, 2010). While he hoped to receive benefits from his plea agreement, Granados

---

[4] He admits the other elements of the offenses were satisfied. (Doc. No. 1103: Motion at 5-6).

took a considerable risk of physical harm by breaking the gang's rule about providing information and testimony about a fellow member. The Court had the opportunity to observe the demeanor of Granados and finds that his testimony was credible. Thus, the evidence does not weigh heavily against the verdict and the Court will not grant a new trial based on the sufficiency of the evidence presented to the jury as to Counts Sixty-one and Sixty-three.

C. Evidence of Uncharged Murders

The defendant next argues that the Court erred by admitting evidence during his sentencing hearing that he had committed three murders in 2005 while living in Los Angeles. (Doc. No. 1103: Motion at 7). Evidence was received that on July 27, 2005, the defendant shot Jose Herrera and Gustavo Porras on Fairfax Street following a gang-related altercation (the "Fairfax Street murders"), and on September 28, 2005, the defendant shot Andy Abarca at Lemon Grove Park (the "Lemon Grove murder"). These murders were not charged as separate crimes, but were alleged by the government as part of a non-statutory aggravating factor ("Participation in Additional Uncharged Murders and Other Acts of Violence"). (Doc. No. 275: Notice at 4 & 7). See also 18 U.S.C. § 3592(c) (directing a capital sentencing jury to consider a number of enumerated statutory aggravating factors, as well as "any other aggravating factor for which notice has been given"). The jury unanimously found this aggravating factor and, specifically, that the defendant had committed both the Fairfax Street and Lemon Grove murders. (Doc. Nos. 1048-51: Penalty Selection Verdict Forms at 2).

In his motion for new trial, the defendant makes a number of objections to the admissibility of evidence related to these murders, chiefly that evidence relating to unadjudicated criminal conduct is per se unreliable; that a jury that has already found a defendant guilty of underlying capital offenses cannot impartially consider evidence of uncharged crimes; and that

allegations of unadjudicated criminal conduct violate a defendant's constitutional right to a presumption of innocence during the penalty phase of a capital trial. The defendant raised the same arguments in his motion to strike this factor from the government's Notice (Doc. No. 483), which the Court considered and denied prior to the defendant's sentencing hearing. (Doc. No. 1000: Order).

The defendant argues for a different result in light of the government's sentencing hearing summation argument, where it drew similarities between the commission of the Greensboro murders and all three Los Angeles murders. He contends that the jury was effectively told to find the defendant guilty of the Los Angeles murders because he committed the Greensboro murders, a violation of his right to a presumption of innocence. However, by arguing the that the charged and uncharged murders were committed in a similar manner, the government did not invite the jury to disregard the defendant's presumed innocence of the uncharged allegations. The Greensboro murders were referenced not as evidence of the defendant's propensity to commit bad acts but to show a series of shootings committed in a similar manner. See United States v. Haney, 914 F.2d 602, 607 (4th Cir. 1990) (citing Fed. R. Evid. 404(b), holding evidence of "a string of robberies committed in the same manner" admissible as "evidence of a signature crime"). The government's reference to the Greensboro murders during its summation argument provides no reason for the Court to retreat from its previous ruling allowing evidence of uncharged conduct during the sentencing hearing.

Similarly, the defendant attempts to resurrect his objection to the admission of this evidence on the ground that it fails to meet a threshold standard of reliability. This issue was already raised in a motion in limine filed by the defendant (Doc. No. 960), which the Court granted in part and denied in part on the basis of the government's proffered evidence (Doc. No.

1021: Order). After conducting an in camera review, the Court determined that, with the exception of proposed testimony by police officers relating eyewitness Freddy Gonzalez' prior identification of the defendant from a photograph line-up as the Lemon Grove shooter, the government's proffered evidence bore sufficient indicia of reliability to warrant admission under the applicable evidentiary standard set out in 18 U.S.C. § 3593(c). (Id.).[5] The Court permitted Gonzalez to testify live as to his prior identifications of the defendant, but prohibited him from making an in-court identification, finding the totality of circumstances unduly suggestive. (Sent. Tr. vol. III-A at 327-35, Apr. 21, 2010).

The Court finds no grounds to re-examine its prior ruling on this matter, as the evidence introduced by the government at the sentencing hearing was consistent with its proffer. With regard to the Fairfax Street murders, Los Angeles Police Department ("LAPD") Officer John Maloney relayed statements by an eyewitness, Noe Bautista, who stated that on the day of the murders,

> He observed two young men walking south on the west side of the street. I guess arguing with three suspects in a vehicle, in a gold Altima, Nissan Altima. And that the vehicle pulled over. They got out, walked passed them. One of the suspects removed the handgun from his waistband and shot the two victims, and then fled back into the vehicle, southbound on Fairfax.

(Sent. Tr. vol. II-A at 161, Apr. 26, 2010). LAPD Detective Gene Parshall testified that two .22 caliber shell casings were recovered from the scene. (Sent. Tr. vol. II-B at 174, Apr. 20, 2010). He also testified that Bautista further stated that one of the occupants who exited the Altima had been on crutches. (Id. at 178). This lead Det. Parshall to Luis Rivera, a known MS-13 member

---

[5] In the same Order, the Court also determined that proffered evidence of the defendant's participation in another murder, the beheading of Jaime Samayoa in El Salvador, lacked sufficient indicia of reliability necessary for admission at the defendant's sentencing hearing. This evidence was never presented to the jury.

who was on crutches when the Fairfax Street murders occurred. (<u>Id.</u> at 178). Rivera was brought in for questioning and eventually stated to Det. Parshall that he and Rene Arevalo, Luis Ramos, Eddie Ruiz, and the defendant had been driving down Fairfax Street in a Nissan Altima on the day of the murders. Arevalo was driving, the defendant was sitting in the front passenger seat, and Rivera, Ramos, and Ruiz were in the back. (<u>Id.</u> at 180). Rivera then gave an account of the shooting and identified the defendant as the shooter. (<u>Id.</u> at 181).

Det. Parshall then testified that Ramos was subsequently brought in for questioning, and after he refused to cooperate, he was put in a holding cell with Rivera. Det. Parshall testified that he and other LAPD personnel had installed audio surveillance in the cell, and observed Rivera and Ramos discussing their desire to avoid serving a prison sentence for a murder they did not commit. (<u>Id.</u> at 183). Several days later, Ramos came forward with a statement identifying the same occupants in the Altima and naming the defendant as the shooter. (<u>Id.</u> at 185). Det. Barry Telis, Det. Parshall's partner, testified that they eventually located Arevalo, who gave a statement that was largely corroborative of Rivera's and Ramos'. (<u>Id.</u> at 229).

Det. Parshall also testified that in April 2008, he and Det. Telis interviewed the defendant regarding the Fairfax Street murders, and the defendant admitted that he had been at the scene with a gun. When asked if he was the shooter, Det. Parshall testified that the defendant responded, "You can say that." (<u>Id.</u> at 191). The defendant also demonstrated to Detectives Parshall and Telis the rival gang signs that the victims had displayed immediately prior to the shooting. (<u>Id.</u>).

As the Court recognized in its previous ruling, cross-examination of Detectives Parshall and Telis revealed that Rivera's, Ramos', and Arevalo's statements were somewhat self-serving in that each attempted to minimize his own involvement in the shooting. The statements were

also inconsistent with respect to some details, such as who exited the automobile and whether they did so in the middle of Fairfax Street or after the Altima had pulled over the side of the road. However, each statement identified the defendant as the shooter and gave details of the shooting that were largely corroborative of each other and of the eyewitness account given by Bautista. Det. Parshall's accuracy in relating these statements to the jury was further ensured by the fact that the defendant was able to cross-examine him with his prior testimony in a state court proceeding. (Id. at 216). Moreover, the defendant's own statements during his April 2008 interview placed him at the scene and, at the very least, tacitly admitted his involvement in the Fairfax Street murders.

With regard to the Lemon Grove murder, Roberto Ramos and Juan Lara gave eyewitness accounts of the shootings and were subject to cross-examination. (Sent. Tr. vol. II-A at 119-48, Apr. 20, 2010). LAPD Det. Thomas Small also testified that he interviewed the defendant, and although the defendant denied being a shooter, he admitted to driving to Lemon Grove Park on the night of the murder with Giovani Rhodus, a.k.a. "Sin," and two other unknown males. According to the defendant, the Lemon Grove shooting was carried out by the two unknown males, while he and Sin stayed in the car. (Id. at 115-16). Det. Small further testified that he recovered .22 caliber shell casings from the scene and submitted them for ballistics analysis. (Id. at 108-09). This testimony was also subject to cross-examination by counsel for the defendant. (Id. at 116-19).

Finally, and perhaps most importantly, LAPD Officer William Moore was tendered by the government as an expert in ballistics firearms analysis. He testified that he had performed ballistics tests comparing the .22 caliber shell casings recovered from the Fairfax Street and Lemon Grove murders. Officer Moore stated that as a result of this testing, he concluded that the

shell casings from both crime scenes had been discharged from the same firearm. (Sent. Tr. vol. II-B at 246-57, Apr. 20, 2010). No evidence was received suggesting that any person other than the defendant was present at both the Fairfax Street and Lemon Grove murders.

As the record reflects, the admitted evidence implicating the defendant in the Los Angeles murders largely matched that which was proffered by the government in response to the defendant's motion in limine. There are no inconsistencies between the government's proffer and what was actually admitted into evidence that warrant a reconsideration of the Court's prior Order finding this evidence admissible.

The defendant also argues that the evidence presented by the government was insufficient to support the jury's finding that he committed the Los Angeles murders. Admittedly, Rivera, Ramos, and Arevalo were vulnerable to credibility attacks stemming from their desire to minimize their own involvement in the Fairfax Street murders. However, the core detail of each statement—that the defendant was the shooter—was sufficiently corroborated by consistencies among their statements and evidence obtained from other sources. Moreover, when evaluating the sufficiency of evidence, the Court reviews "the complete picture that the evidence presents." United States v. Burgos, 94 F.3d 849, 863 (4th Cir. 1996) (citing United States v. Al-Talib, 55 F.3d 923, 931 (4th Cir. 1995)). The government also introduced the defendant's own incriminating statements, establishing his presence at both murder scenes, and ballistics evidence matching both shootings to a single firearm. Viewed as a whole, this evidence weighs in favor of the jury's finding, not against it. The defendant has therefore failed to show an insufficiency in the evidence supporting the jury's finding that he committed the Los Angeles murders to warrant a new trial on the matter.

D. Future Dangerousness Finding

The defendant claims that he is entitled to a new sentencing hearing because the penalty selection verdict forms (Doc. Nos. 1048-1051) did not require the jury to find the non-statutory aggravating factor of future dangerousness. (Doc. No. 1103: Motion at 15). The government provided notice to the defendant that it would seek the death penalty, in part, based on future dangerousness "as evidenced by" his alleged engagement in a continuing pattern of violence, low rehabilitative potential, lack of remorse, and gang membership. (Doc. No. 275: Notice at 5). After the jury found that the defendant was eligible for the death penalty, the government presented evidence relating to these allegations. The Court proposed instructions and verdict forms that tracked the government's notice, and the defendant voiced no objections to them. (Sent. Tr. vol. V-B at 800, Apr. 27, 2010). Accordingly, this issue is subject to plain error analysis. United States v. Olano, 507 U.S. 725, 732 (1993).

Here, there was no error in the verdict forms. They asked the jury to give "yes" or "no" answers whether "the government has proven beyond a reasonable doubt that the defendant is likely to commit criminal acts of violence in the future which would constitute a continuing and serious threat to the lives and safety of others, as evidenced by at least one or more" of the four alleged factual circumstances. Thus, the jury necessarily found the non-statutory aggravating factor of future dangerousness when it answered "yes" to each of the four circumstances on each of the four verdict forms. The phrasing of the issue protected the defendant from the jury going beyond the specifically alleged circumstances in finding this aggravating factor. Even if the phrasing was in error, it can not be said that it affected the defendant's substantial rights because

the jury was not required to find future dangerousness in order to return death verdicts.[6]

Accordingly, a new trial is not required based on the penalty selection verdict forms.

      E.      Exclusion of Police Report

      The defendant claims the Court's exclusion of a police report documenting an interview with his mother in 2008 prejudiced his mitigation case. (Doc. No. 1103: Motion at 16-17). At the time the evidence was offered, defense counsel stated the purpose was to complete the defendant's life story, establish when and where he was born, and address his personal identity. (Sent. Tr. vol. IV-B at 589, Apr. 26, 2010). The defendant now claims that the report would have strengthened his claims that the family was displaced by violence in El Salvador and that the defendant's father was uncooperative with the defense investigation, and would have explained the defendant's father's role in his life. (Doc. No. 1103: Motion at 16-17). The defendant made an offer of proof on the contents of the report, which was written in Spanish, outside the presence of the jury. (Sent. Tr. vol. V-B at 921-24, Apr. 27, 2010).

      A capital defendant is entitled to present any information relevant to a mitigating factor. 18 U.S.C. § 3593(c). Relevant evidence is that which tends to make the existence of a fact of consequence more or less probable that it would be without the evidence. Fed. R. Evid. 401. Here, the government provided a birth certificate and Salvadoran police report which alleged the defendant was born in Guatemala, not El Salvador as the defendant's father had reported and another birth certificate showed. The newly-provided birth certificate listed a date of birth two years earlier than the one obtained by the defense mitigation investigator and listed a different

---

[6] In its verdict finding the defendant eligible for the death penalty, the jury found two statutory aggravating factors, either of which, standing alone, could have supported imposition of that sentence. (Doc. Nos. 1044-1047); 18 U.S.C. §§ 3591(a)(2), 3592(c)(5), (16), and 3593(e)(2).

person as the defendant's father. The Court's admission of this newly-provided birth certificate put that information before the jury.

The interview with the mother did not give the reasons why the family moved to Guatemala for a period of time or why a different person was listed as father, it merely recited the same detail as the newly-provided birth certificate. As such, the police report did not shed light on the effect of the civil war in El Salvador on the family, the role of the defendant's father in his life, or the defendant's personal sense of identity. The mitigation investigator testified at length regarding information provided to him by the defendant's father (Sent. Tr. vol. IV-A at 522-26, Apr. 26, 2010; Sent. Tr. vol. IV-B at 533-47, Apr. 26, 2010). Nothing in the report of the mother's interview in 2008 would have informed the jury why the father refused to introduce the investigator to other family members in 2009, if that were even relevant. (Sent. Tr. vol. IV-A at 521, Apr. 26, 2010). Thus, the police report did not make any facts of consequence relating to the defendant's mitigating factors more or less probable and was properly excluded.

F.      Defendant's Statement to LAPD Detectives

The defendant claims the admission of his statement to LAPD detectives at the time he was in custody and represented by an attorney on North Carolina charges violated his Fifth and Sixth Amendment rights and requires a new sentencing hearings. (Doc. No. 1103: Motion at 17). The defendant raised this issue in a pre-trial motion to suppress (Doc. No. 490), which the Court denied after an evidentiary hearing on August 26, 2009 (Doc. No. 684: Supp. Hr'g Tr. at 98-103). The motion for new trial does not raise any new facts or law to reconsider that ruling. Therefore, a new sentencing hearing is not required in the interest of justice.

G.      Expert Testimony of Frank Flores

During the defendant's trial, Det. Frank Flores of the Los Angeles Police Department

15

was permitted to testify as an expert in the structure, history, and nature of MS-13. Over the defendant's objection, the evidentiary basis of which was not articulated, Det. Flores gave the following testimony:

> Q. Well, have you had, in your experience has there been any situations where a civilian has been killed out of disrespecting the gang?
>
> A. Yes, I mean --
>
>       * * *
>
> Violence is generally very common. A lot of things happen unplanned or may happen on very short notice. Disrespect, somebody is confronted, they react. Yes, they're required to act appropriately, whether confronted or disrespected by rival gang member, by somebody from the general public who they have taken some kind of disrespect from. It's part of the normal, everyday activities.

(Trial Tr. vol. I at 63, Apr. 13, 2010). This specific testimony was relevant, albeit peripherally, to the government's theory that although the Greensboro shooting victims were not members of a rival gang, their murders were carried out by the defendant to promote respect for MS-13 and, thus, aid that racketeering enterprise.

  The defendant previously moved to prohibit Det. Flores from testifying on both <u>Daubert</u> and <u>Crawford</u> grounds. (Doc. No. 962). In support, the defendant argued that Det. Flores' personal involvement with the investigation of the Los Angeles murders would cause him to relate inadmissible hearsay evidence to the jury under the guise expert testimony. The Court denied this motion prior to trial (Doc. No. 981: Order), citing <u>United States v. Ayala</u>, 601 F.3d 256 (4th Cir. 2010), in which the Fourth Circuit recently upheld the admission of Det. Flores' and two other experts' testimony concerning the history, structure, and practices of MS-13 against an almost identical <u>Crawford</u> challenge. There, even assuming that the experts had relied on testimonial hearsay statements to form their opinions, the Fourth Circuit held:

That fact alone does not offend the Confrontation Clause because the experts did not act as mere transmitters and in fact did not repeat statements of particular declarants to the jury. Instead, they offered their independent judgments, most of which related to the gang's general nature as a violent organization and were not about the defendants in particular. These judgments resulted from many years of observing the gang, studying its methods, and speaking with its members. Given that each expert was subject to cross-examination about his judgment, we find no error in the admission of their testimony.

Id. at 275. Similar to the testimony he gave in Ayala, the Court permitted Det. Flores to offer expert testimony about the general nature of MS-13, but prohibited him from relating facts or hearsay statements gleaned during his involvement with the defendant's investigation.[7]

Aside from renewing this general challenge to Det. Flores' testimony, the defendant now argues that Flores' testimony concerning his prior experience with gangs was improper character evidence under Fed. R. Evid. 404(b), which states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

"The general rule is that the prosecution may not introduce evidence of extrinsic offenses to demonstrate the defendant's propensity to commit unlawful acts or to prove that the defendant committed the crime with which he is presently charged." United States v. Davis, 657 F.2d 637, 639 (4th Cir. 1981). "Rule 404(b) has been characterized as an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove only criminal disposition." United States v. Percy, 765 F.2d 1199, 1203 (4th Cir. 1985) (citing United States v. Masters, 622 F.2d 83, 85 (4th Cir. 1980)).

---

[7] Flores was not called by the government to testify as a fact witness.

Essentially, the defendant argues that Det. Flores' testimony suggested that because other gangs condoned the killing of civilians, MS-13 condoned the defendant's commission of the Greensboro murders. However, even if this is true, Det. Flores' response did not run afoul of Rule 404(b). He was well within scope of his expertise to testify about his prior experience with gangs, and the statement was a generalized one that had no direct link to the defendant. Rule 404(b) erects no barrier to evidence of other crimes or bad acts committed by third parties, for such acts cannot bear upon the defendant's own character. Cf. United States v. Smallwood, 306 F. Supp. 2d 582, 587 (E.D. Va. 2004) ("Rule 404(b) prohibits the admissibility of evidence of acts committed by a person, other than the charged act, when offered to show that the person has the propensity or character to commit the same act on another occasion."). Det. Flores' statement that gangs often condoned violence against civilians was therefore outside the scope of character evidence prohibited under Rule 404(b).

H.      Government's Rebuttal Argument

Next, the defendant claims that certain statements in the government's rebuttal argument during the sentencing hearing were improper and were designed to inflame the emotions and passions of the jury. (Doc. No. 1103: Motion at 25). In determining whether improper remarks require corrective action, several factors are considered:

> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

United States v. Harris, 498 F.3d 278, 293 (4th Cir. 2007). Where there is no contemporaneous objection, comments are reviewed for plain error. Id. at 292.

1.      Gang members' behavior in prison

At the beginning of her rebuttal argument, the Assistant United States Attorney (AUSA) referenced the number of MS-13 gang members in federal prison as related by a defense witness and remarked, "And I can promise you that if one of them was there for life and was behaving, we would have heard all about it."[8] (Sent. Tr. vol. V-B at 888, Apr. 27, 2010). The defendant complains this was unfair because the government successfully blocked his attempt in discovery to obtain data from the Bureau of Prisons ("BOP") about MS-13 gang members' behavior in jail. (Doc. No. 1103: Motion at 25). Nevertheless, a former BOP warden called by the defense testified that the BOP did not consider MS-13 a disruptive group (Sent. Tr. vol.V-A at 706, Apr. 26, 2010), and defense counsel highlighted that evidence in arguing against the future dangerousness aggravating factor. (Sent. Tr. vol.V-B at 851, Apr. 27, 2010).

The AUSA's isolated comment, then, was not an unfair response to that evidence and argument, but simply called into question the witness's opinion. Because the Court instructed the jury that it was to make an individualized assessment of the defendant in deciding punishment (Id. at 917), the jury was not misled into considering the behavior of other MS-13 members in jail. Additionally, the evidence was extensive regarding the defendant's own continued violent conduct while incarcerated, including his ability to obtain weapons. Therefore, the defendant was not unfairly prejudiced by the comment.

2.      Defendant only killer

Next the defendant complains about the AUSA's argument about him being the "only

_____

[8] The defendant did not object to this comment.

killer" among the MS-13 gang members mentioned in the trial.[9] (Id. at 888-89). He claims this was unfair because the Court prohibited him from offering evidence of other murders committed by other gang members in support of a proposed mitigating factor that such individuals in the same conspiracy did not receive the death penalty. (Doc. No. 1103: Motion at 26). In context, the AUSA's argument was consistent with evidence that the defendant was the only trigger-man in each of the murders at issue in the trial, that is, at the Greensboro restaurant, on the Fairfax Street sidewalk, and in Lemon Grove Park. The jury had heard testimony about a gang-related murder involving government witness Rony Lopez in which the defendant did not participate. Therefore, it is not likely that they were misled by the argument that stressed the defendant's greater culpability in the murders at issue in the trial, and, thus, urged greater punishment.

### 3. Callous disregard

The government originally sought to establish a non-statutory aggravating factor of callous disregard for the severity of the offense. (Doc. No. 275: Notice at 3). The defense moved to strike that factor (Doc. No. 488: Motion at 2), which the Court granted as potentially duplicative of the lack of remorse sub-part of the future dangerousness factor (Doc. No. 1000: Order at 22). When the AUSA began to mention callous disregard as a mitigating factor, defense counsel immediately objected, and the court immediately instructed the jury to disregard such comments. (Sent. Tr. vol.V-B at 896-97, Apr. 27, 2010). The AUSA immediately went on to argue the issue of lack of remorse, which was proper for the jury to consider. (Id. at 897-98). The defendant was not prejudiced by this fleeting remark, which was an innocent mistake, considering the government's proposed aggravating factor on callous disregard, which the Court disallowed.

---

[9] The defendant did not object when the argument was made, but raised it at side-bar at the conclusion of the jury instructions. (Sent. Tr. vol. V-B at 914, Apr. 27, 2010).

The subsequent jury instructions and verdict forms made no mention of that factor, so there is no risk that the jury misunderstood the was issue it was to decide.

        4.      The shank

After the AUSA argued that the defendant's lack of remorse was shown by looking for rival gang members to attack after the Greensboro murders, by insinuating he would shoot police if they tried to stop him, and by threatening witnesses, she added to the list that the defendant came to court with a shank.[10] (Id. at 898). The defendant is correct that this comment overstates the evidence. (Doc. No. 1103: Motion at 27). A deputy United States Marshal testified that he found a knife strapped to the defendant's penis during a search immediately prior to bringing him from the local jail to the federal courthouse for the first day of jury selection. (Sent. Tr. vol. III-A at 359-360, Apr. 21, 2010). So, the defendant was prevented from bringing the knife to the courthouse, but it is a fair inference from the circumstances that the defendant intended to do so. In this context, the Court does not find that the discrepancy was deliberately put before the jury to mislead them. The jury had been instructed to disregard argument of counsel that conflicted with their recollection of the testimony, and there is no reason to find that they did not do so here.

Defense counsel objected when the AUSA went on to question rhetorically what rivals the defendant had at the courthouse[11] and to conclude that his rivals were the marshals, the judge, and the jury. (Sent. Tr. vol. V-B at 898-99, Apr. 27, 2010). The Court sustained the objection (Id. at 899), but does not now find that such comment inflamed the passions of the jury such that their

---

[10] The defendant did not object to this characterization of the evidence.

[11] During cross-examination of the deputy, defense counsel suggested that the knife could have been possessed for self-defense, given the presence of rival gang members in the jail. (Sent. Tr. vol. III-A at 367-68, Apr. 21, 2010).

verdicts were impermissibly based on emotion. The evidence of the defendant's possession of the knife while in the transportation process to come to federal court was compelling in itself, as reflected by the jury's visible reaction when the deputy testified. Additionally, the defendant wrote in letters about other shanks he possessed and sought to give to gang members. Thus, absent the remarks, the strength of the evidence was sufficient for the jury to find the non-statutory aggravating factor.

5.      American justice

Next, the defendant charges that the AUSA appealed to anti-immigrant beliefs, creating a risk that the verdict was based on the defendant's ethnic and national origin. (Doc. No. 1103: Motion at 28). The story in this trial, as presented by both the government and the defendant, centered on the MS-13 gang and necessarily involved descriptions of conduct of those from and in El Salvador and its effect on criminal activity in this country. In their closing argument, defense counsel repeatedly discussed conditions and activity in El Salvador in explaining the defendant's background, character, and participation in the gang.[12] (Sent. Tr. vol. V-B at 854, 856-58, 862, 878, Apr. 27, 2010). It was regrettable, but invited,  for the AUSA to argue in response that criminal activity committed by an El Salvadoran gang in this country should be met with American justice.[13] (Id. at 899). As such, the comments were not an appeal to racial animus. Even if they were improper, the defendant was not prejudiced because the jury was instructed that considerations of national origin could not play a part in the verdict (Id. at 911), and each of the jurors certified that it had not (Doc. Nos. 1048-1051: Penalty Selection Verdict Forms at 9).

---

[12] As reflected in the jury's findings regarding mitigating factors, information about El Salvador benefitted the defendant. (Doc. Nos. 1048-1051: Penalty Selection Verdict Forms at 4-5).

[13] The defendant did not object to this argument.

Accordingly, the AUSA's call for American justice did not affect the defendant's substantial rights.

### 6. Send a message

In a side-bar conference following closing argument, the Court informed the parties that it would, sua sponte, instruct the jury that it was not to send a message to anybody else in determining the appropriate sentence for the defendant and shortly afterwards gave such direction. (Sent. Tr. vol. V-B at 917, Apr. 27, 2010). That action was in response to the AUSA's urging the jury to send a message to the community and MS-13 by returning death verdicts.[14] (Id. at 899, 904). The defendant now argues that this line of argument likely caused the jury to sentence him to death to deter MS-13 crimes. (Doc. No. 1103: Motion at 29). The Court's instruction was sufficient to remedy this improper appeal which occurred at near the end of the AUSA's summation. Given the weight of the evidence and the individualized determination shown in the verdict forms, it is clear that the jury did not return death verdicts to send a message to the community or the gang.

### 7. Tears on the scale

Next, the defendant claims the AUSA argued sympathy for the victims' families as a basis for imposing the death penalty. (Id.). The Supreme Court has held that the Constitution does not prohibit consideration of the harm to the family of a victim in determining whether the death penalty should be imposed, Payne v. Tennessee, 501 U.S. 808 (1991), and Congress has specifically provided for it in federal prosecutions, 18 U.S.C. § 3593(a). Therefore, it was not improper for the AUSA to use the rhetorical device of asking the jury to place the tears of the

---

[14] The defendant did not object to this argument.

daughters of one of the victims "on the scale" as aggravating and mitigating factors were weighed. (Sent. Tr. vol. V-B at 902, Apr. 27, 2010). In doing so, she was asking the jury to consider the extent and scope of the loss suffered by the victims' families, which is clearly authorized by federal law.

8.      Inmates' bill of rights

Seeking to counter the government's evidence of future dangerousness, the defendant presented testimony during his mitigation case from Dr. Mark Cunningham, a psychologist, who was offered as an expert in the procedures used by the BOP to control prison violence. (Sent. Tr. vol. IV-A at 429, Apr. 26, 2010). On direct examination, he testified about the environment for prisoners at the BOP's highest security prison, located in Florence, Colorado. He opined that inmates sentenced to life without parole have a greater incentive than the average prisoner to behave to protect their institutional privileges, like buying potato chips and beans at the commissary. (Id. at 440). Additionally, he detailed restrictions that could be placed on inmates who posed a security threat. (Id. at 461, 466, 476-79). On cross-examination, the government sought to highlight circumstances that would limit the ability of privileges and restrictions to control an inmate's behavior. Among those circumstances was the list of rights to which inmates are entitled that are balanced against security concerns. (Id. at 503-07).

The defendant relies on Le v. Mullin, 311 F.3d 1002 (10th Cir. 2002), for his argument that the AUSA's comments about the life the defendant would lead even in the most restrictive prison (Sent. Tr. vol. V-B at 902-03, Apr. 27, 2010) were improper.[15] (Doc. No. 1103: Motion at 29-30). That court was concerned that the over-emphasis of the permanency of the death of the

---

[15] The defendant did not object to this argument.

victim compared to the continued life of the defendant might cause the jury to disregard mitigating factors. Id. at 1016. Nevertheless, the court found that the overwhelming evidence of the defendant's guilt, the strength of the aggravating factors, and the trial court's instructions rendered the error harmless. Id.

Here, the findings on the penalty selection verdict forms shows that the jury did not disregard the mitigating factors. (Doc. Nos. 1048-1051: Penalty Selection Verdict Forms at 4-6). The context in which the evidence was presented related to the aggravating factor of future dangerousness, as in United States v. Higgs, 353 F.3d 281, 332 (4th Cir. 2003) (comments about comfortable life defendant would lead in prison were proper to counter argument that he would serve sentence in high-security environment with constant monitoring). Additionally, the strength of the evidence of guilt and aggravating factors renders any error in such argument harmless. The Court instructed the jury that it could not take any adverse inference from the defendant's exercise of his constitutional rights during the trial; therefore, there was no risk that the jury would confuse those rights with those applicable while incarcerated.

A death verdict may not be imposed under the influence of passion, prejudice, or any other arbitrary factor. 18 U.S.C. § 3595(c)(2)(A). Having considered each of the government's alleged improper arguments and the record of the trial and sentencing hearing as a whole, the Court finds that the comments separately and collectively provide no basis to conclude that the jury returned the verdicts under improper influence. Thus, a new sentencing hearing is not required in the interest of justice.

I.      Execution Impact Evidence

The defendant next argues that he was denied due process when the Court refused to instruct the jury on the following proposed mitigating factor:

14. The execution of Alejandro Enrique Umana would cause grief and loss to his son Rafael and to Monica Reyes.

(Doc. No. 1024 at 2). This factor was subject to a motion in limine filed by the government (Doc. No. 1020), which the Court granted, finding "execution impact" evidence irrelevant to the defendant's characteristics, his history, or the circumstances of the offense. (Sent. Tr. vol. V-B at 804, Apr. 27, 2010). See also Lockett v. Ohio, 438 U.S. 586, 604 n.12 (1978) (authorizing the trial court to exclude "as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense").

As a preliminary matter, because the Court's ruling came after the defendant had rested his case in mitigation, he was in no way prevented from presenting mitigating evidence to the jury related to his family. The mitigation investigator testified at length about the defendant's life in El Salvador and his family. (Sent. Tr. vol. IV-B at 577-86, Apr. 26, 2010). The defendant published a video recording of an interview that the investigator had conducted with Monica Reyes, allowing her statements about the defendant's characteristics to reach the jury. (Id. at 573-74). By granting the government's motion in limine, the Court did not prevent the jury from considering this evidence; the Court simply declined to give an instruction that execution impact was a stand-alone, non-statutory mitigating factor.

In the instant motion, the defendant argues that a mitigating factor directing the jury to consider execution impact evidence should have been allowed as relevant to the defendant's character and background. A few federal courts have held that execution impact evidence is a valid mitigating factor under this theory. See United States v. Wilson, 493 F. Supp. 2d 491 (E.D.N.Y. 2007); United States v. Fell, No. 2:01cr12-01, 2005 WL 1634067 (D.Vt. July 5, 2005). However, these decisions are not controlling within the Fourth Circuit, and the Court finds their

reasoning unpersuasive. Permitting a capital defendant to argue execution impact as a mitigating factor would run contrary to the principles underpinning Payne where the Supreme Court overruled in part Booth v. Maryland, 482 U.S. 496 (1987), and South Carolina v. Gathers, 490 U.S. 805 (1989), to allow the admission of victim impact evidence as an aggravating factor. However, Payne reaffirmed Booth and Gathers to the extent they prohibit victim impact testimony that advocates for a sentence of death. 501 U.S. at 830 n.2. Applying these principles to mitigating evidence, a logical extension of Payne would allow family of the defendant to testify about his life and characteristics, but prohibit them from specifically advocating against the death penalty or its likely impact on their lives. See United States v. Taylor, 583 F. Supp. 2d 923, 944 (E.D. Tenn. 2008) (citing Payne, 501 U.S. at 827) ("The parallel between defendant and victim supports prohibiting witnesses from opining on their desired sentence, regardless of their preference."). That is exactly what occurred in this case.

Finally, the Court notes that the jury remained free to find the existence of "[a]ny other factor in the Defendant's background, record, or character or any other circumstance of the offense that mitigates against imposition of a death sentence." (Doc. Nos. 1048-51: Penalty Selection Verdict Forms at 6). Even if the defense counsel could not raise the notion of execution impact during summation argument, the jury was not necessarily prohibited from doing so on its own. No juror elected to make such a finding. (Id.). Thus, the defendant has not shown that the Court's ruling striking execution impact as a mitigating factor violated his right to due process or otherwise mandates a new trial.

IV.     CONCLUSION

**IT IS, THEREFORE, ORDERED** that the defendant's motion for new trial (Doc. No.

1103) is **DENIED**. The Clerk is directed to certify copies of this order to the defendant, counsel

for the defendant, and to the United States Attorney.

Signed: July 27, 2010

Robert J. Conrad, Jr.
Chief United States District Judge